## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

PHAYSANH KHAKEO,    :
   Plaintiff,     :
            :
v.            :    **C.A. 04-11941-RWZ**
            :
CITY OF LOWELL, et al.,   :
   Defendants.    :

### DEFENDANT KEVIN SULLIVAN'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT

As reasons for requesting summary judgment in his favor, Sullivan states the following:

### I. STANDARD OF REVIEW

Summary judgment shall be granted when there is no genuine issue as to any material fact and where the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56 (c). In this context, "[a] dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party. A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law." *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52 (1st Cir. 2000) (citations omitted). Once the moving party identifies those portions of "the pleadings, depositions, answers to interrogatories, . . . admissions . . . [and] affidavits, if any" that "it believes demonstrate the absence of a genuine issue of material fact," the adverse party may avoid summary judgment only by providing properly supported evidence of disputed material facts necessitating a trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### II. COUNT I (§ 1983 Failure to Intervene)

As it relates to Sullivan, Count I of the Complaint alleges that Sullivan failed to protect the Plaintiff from Moriarty's purported use of unreasonable force and, because Sullivan was in a position to intervene, Sullivan's dereliction subjects him to liability pursuant to § 1983. (Compl. ¶

-1-

21, 29-32.) This Court should render summary disposition in favor of Sullivan because, considered

within the appropriate constitutional framework, the summary judgment record "fails to yield a

trialworthy issue"; *Martinez v. Colon*, 54 F.3d 980, 983-84 (1st Cir. 1995); over any question of

material fact related to this claim and the applicable law favors judgment in favor of Sullivan.

### A.    THRESHOLD IDENTIFICATION OF THE CONSTITUTIONAL RIGHT IMPLICATED BY THE CLAIM AGAINST SULLIVAN

To begin, because § 1983 "is not itself a source of substantive rights," but rather provides a

vehicle "for vindicating federal rights elsewhere conferred," summary judgment analysis of the

Plaintiff's claim necessarily must begin with the identification of the precise constitutional right

allegedly deprived by Sullivan's purported omission. *See Graham v. Connor*, 490 U.S. 386, 393-94

(1989) (citations omitted).[1] Upon examination of the question, Sullivan submits that the

constitutional right put in issue by the Plaintiff's failure to intervene claim is the liberty interest as

protected by the substantive component of the Due Process Clause of the Fourteenth Amendment.

*See, e.g., County of Sacramento v. Lewis*, 523 U.S. 833 (1998).

As a review of the pertinent case law demonstrates, a § 1983 claim alleging that a state actor

impermissibly failed to intervene in another official's unreasonable use of force implicates either the

protection against unreasonable seizures afforded by the Fourth Amendment or the protection of

certain liberty interests as conferred by the substantive component of the Due Process Clause of the

---

[1]Because the relevant portion of the Complaint; ¶¶ 27-32; generally invokes the Plaintiff's
constitutional right to remain free from governmental use of unreasonable force, it is not clear
whether the Plaintiff is claiming, with respect to Sullivan, a violation of the Fourth Amendment,
as incorporated against state action by means of the Due Process Clause of the Fourteenth
Amendment, or is claiming a "direct" violation of the substantive component of the Due Process
Clause of the Fourteenth Amendment. This is of no moment, however, because, in this setting,
"it is incumbent upon the [C]ourt 'to isolate the precise constitutional violation . . . .'" at issue.
*Jesionowski v. Beck*, 937 F.Supp. 95, 103 (D.Mass. 1996).

Fourteenth Amendment. *See, e.g., Torres-Rivera v. O'Neill-Cancel*, 406 F.3d 43, 45, 49-53 (1st Cir.

2005) (in § 1983 failure to intervene claim, analyzing appellate contention that trial court erred by

instructing jury on Fourth Amendment standard rather than Fourteenth Amendment standard);

*Wilson v. Town of Mendon*, 294 F.3d 1, 14 n.29 and accompanying text (1st Cir. 2002) (recognizing

distinction in due process case law between situations in which officials must make split-second

judgments, for which high degree of fault is required in order to attach liability, and more

contemplative settings, in which degree of fault necessary for liability is "correspondingly lower";

concluding that "same general principle informs our analysis in failure to intervene cases"); *Davis v.*

*Rennie*, 264 F.3d 86, 97-100 (1st Cir. 2001) (affirming trial court's refusal to instruct jury, in failure

to intervene claim, on Fourteenth Amendment standard because, given instructions that were

provided and jury's subsequent verdict, jury necessarily had concluded that defendants had sufficient

time to prevent unreasonable use of force and such a "factual element" removed "case from . . .

ambit of" due process claim).[2]  By no means is this determination a "matter of mere words" because,

in order to sustain a Fourteenth Amendment claim, "the executive conduct must shock the

conscience," while "conduct subject to Fourth Amendment scrutiny is unconstitutional merely if it is

unreasonable." *McIntyre v. United States*, 336 F.Supp. 2d 87, 101 n.9 (D.Mass. 2004) (citations and

---

[2]Although *Graham v. Connor*, 490 U.S. at 395, expressly held that all excessive force
claims against law enforcement officials are to be analyzed under the Fourth Amendment rather
than a "substantive due process approach," that holding does not dictate the nature of the
constitutional right placed in issue by a failure to intervene claim. Unlike a claim of excessive
force, in which "the Fourth Amendment provides an explicit textual source of constitutional
protection," meaning "that Amendment, not the more generalized notion of 'substantive due
process,' must be the guide"; *id.*; a failure to intervene so as to prevent the unreasonable use of
force *by another* is not the subject of such explicit textual reference in the Constitution.
Therefore, as the aforementioned First Circuit decisions collectively recognize, independent
inquiry into the constitutional right implicated by a particular failure to intervene claim is
required.

quotation marks omitted).

Turning to the constitutional right implicated by the claim here and, attendantly, the appropriate constitutional standard by which to evaluate the viability of the claim against Sullivan, the decisions in *Torres-Rivera*, 406 F.3d 43; *Wilson*, 294 F.3d 1; and *Davis*, 264 F.3d 86, prove instructive. As these cases recognize, the identification of the precise constitutional right put in issue by a failure to intervene claim follows a focused analysis assessing the totality of circumstances existing at the time of the alleged failure. More particularly, the "general principle" for failure to intervene claims creates a conceptual divide between those rapidly evolving circumstances in which considered reflection gives way to the necessity of hasty judgments and those circumstances in which "officers have sufficient opportunity to reflect on their course of action." *Wilson*, 294 F.3d at 14, n.29. In the former set of circumstances, "the degree of fault must be extremely high before liability attaches," whereas in the latter, given the opportunity for measured determinations, the degree of fault necessary to establish liability is "correspondingly lower." *Id.*; *see also Davis*, 264 F.3d at 97-100. Here, if this Court determines that the situation existing at the time of the alleged failure to intervene did not admit of the chance for measured reflection, the Plaintiff has articulated a Fourteenth Amendment claim, with a "shocks the conscience" standard for evaluating Sullivan's conduct. Conversely, if this Court determines that the situation presenting itself was more relaxed and contemplative, the Plaintiff has articulated a Fourth Amendment claim, and this Court is to pass upon the reasonableness of Sullivan's conduct. *See Davis*, 264 F.3d at 97-100.

The summary judgment record reveals that the circumstances existing at the moment at which the Plaintiff claims that Sullivan should have intervened were anxious, foreboding and did not admit of sufficient occasion for measured actions. Although detailed in greater depth in the attached

-4-

Statement of Undisputed Material Facts, a summary of the critical facts proves helpful. The chronology of events culminating in the alleged failure to intervene began when Sullivan responded to a report of a large fight, involving a number of gang members with baseball bats and machetes, in an area of Lowell that Sullivan knew to be peculiarly dangerous. (St. of Undisp. Facts, ¶ 6-7.) As he and Moriarty responded to the location, they observed Asian males fleeing the area of the brawl. (Id., ¶ 8-9.) Operating under the belief that these individuals might have been involved in the brawl and now were attempting to elude detection by the police, Sullivan stopped his cruiser to conduct further inquiry when the men ducked into a driveway area. (Id., ¶ 10-11.) As Sullivan entered this enclosed space, he observed not only three Asian males being detained and frisked for weapons by Moriarty, but also a very large group of individuals gathered in this area. (Id., ¶ 11-14.) At this point, Sullivan had a reasonable basis to believe that the individuals being detained may have been involved in the brawl around the corner and, if so, might possess dangerous weapons or otherwise pose a threat to his and Moriarty's safety. In addition, at this point, Sullivan reasonably could not have known whether, or to what extent, this large group of persons, accompanied as it was by the obvious presence of alcohol (id., ¶ 14), itself posed a threat. Indeed, as Sullivan later would learn, a significant risk actually was present, as one of the group would commit a battery upon Sullivan in short order. (Id., ¶ 22-24.)

With the investigatory detention of the three males under control, Sullivan turned his attention to this gathered group, trying to maintain calm by explaining why the police were present and why the three males were being detained. (Id., ¶ 15-18.) His justifiable anxiety increased, however, when these attempts at explanation were met with abusive and profane statements from members of the gathered group. (Id.) This venomous response was particularly disquieting because Sullivan knew that, if the security of the situation disintegrated, he and Moriarty were outnumbered

severely and additional back-up officers, although perhaps close in proximity, functionally were
distant given the magnitude of the call to which they were responding around the corner. (Id., ¶ 18-
19.) Soon thereafter, tension increased as Sullivan observed Moriarty and the Plaintiff verbally
engaged with one another. (Id., ¶ 19.) After directing his attention back to crowd control and after
his attention then was drawn to Moriarty and the Plaintiff a second time, Sullivan observed the two
men *already* engaged in mutual combat, each gripping the shirt of the other. (Id., ¶ 19-20.) Sullivan
turned, and, as he attempted to proceed toward the location of this confrontation, a member of the
gathered group, Inthala Vannaraj, punched Sullivan on the right side of his head. (Id., ¶ 22-24.)
Now guided by instinctual notions of self-defense, Sullivan seized Vannaraj and held him securely
on the ground while yelling at the gathered group to stay back until additional officers arrived. (Id.,¶
24.)

As presenting itself to Sullivan, this sequence of events leaves little doubt that the set of
circumstances existing at the time that the Plaintiff alleges that Sullivan failed to intervene was
rapidly evolving and exceedingly dangerous. Indeed, for a good percentage of the time in which it is
alleged that Sullivan failed to intervene, Sullivan's actions were dictated by the exigent circumstance
of a battery committed on his person, and the need to defend himself from further attack.[3] As this
situation precluded any reasonable chance for measured reflection by Sullivan, the Plaintiff's failure
to intervene claim should be treated as alleging a violation of the substantive component of the Due

---

[3]An overarching point that should be kept in mind in evaluating the Plaintiff's claim, a
point that renders this particular failure to intervene claim unique, is the fact that Sullivan's
ability to intervene functionally was ended by the intervening exigent circumstance of Vannaraj's
battery. Research has revealed no case in which failure to intervene liability has attached when a
bystander's ability to intercede itself was prevented by a battery committed upon the bystander.
As to this point, this Court should take guidance from the "abiding principle of jurisprudence that
common sense does not take flight when one enters a courtroom." *State v. Ceballos*, 266 Conn.
364, 391 n.37 (2003). Failure to intervene liability should not attach in this instance.

Process Clause of the Fourteenth Amendment. *See County of Sacramento*, 523 U.S. 833; *see also Wilson*, 294 F.3d at 14, n.29 and accompanying text; *Davis*, 264 F.3d at 97-100.[4]

**B.    SULLIVAN IS ENTITLED TO SUMMARY DISPOSITION BASED UPON THE LACK OF DISPUTE OVER THE MATERIAL FACTUAL PREDICATE AND APPLICATION OF THE RELEVANT LEGAL PRINCIPLES.**

The legal landscape thus set, the inquiry then proceeds to whether the summary judgment record reveals a trialworthy issue on Sullivan's claimed failure to intervene. *See Martinez*, 54 F.3d at 983-84.  In conducting such an analysis, this Court is guided by the general principle in this Circuit that "[a]n officer may be liable not only for his personal use of excessive force, but also for his failure to intervene in appropriate circumstances to protect an arrestee from the excessive use of force by his fellow officers." *Wilson*, 294 F.3d at 6; *see also Gaudreault v. Municipality of Salem*, 923 F.2d 203, 207 n.3 (1st Cir. 1990) ("An officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held liable under [§] 1983 for his nonfeasance.").  According to circuit precedent, however, failure to intervene liability may not attach unless that officer had a realistic opportunity to prevent the use of force. *Davis*, 264 F.3d at 97-100, 102-04; *Gaudreault*, 923 F.2d at 207 n.3 (*citing O'Neill v. Krzeminski*, 839 F.2d 9, 11-12 (2d Cir. 1988)).

---

[4]The right at issue having been isolated, this Court should bear in mind that in situations in which officers' "decisions have to be made in haste, under pressure, and frequently without the luxury of a second chance," "only a purpose to cause harm unrelated to . . . [a] legitimate object . . . will satisfy the element of arbitrary conduct shocking to the conscience." *County of Sacramento*, 523 U.S. at 853.

Should this Court find that the opportunity for considered reflection was possible in this situation, the constitutional right then put at issue would be the Fourth Amendment, and the appropriate standard of review for Sullivan's conduct would be the "objectively reasonable" standard. *See Graham*, 490 U.S. 386.  Should that be the case, the remaining arguments in this Memorandum apply with equal force and Sullivan respectfully submits that his conduct passes constitutional muster within that framework as well.

Interestingly, the United States Supreme Court has not recognized expressly a duty to intervene in the § 1983 context. In fact, in the circumstances most analogous to the failure to intervene claim as presented here, the Supreme Court has declined to recognize a principle of liability premised upon a party's failure to prevent harm that was perpetrated by another. *Town of Castle Rock, Colorado v. Gonzales*, 545 U.S. ___, ___ (Docket No. 04-278) (June 27, 2005) (declining to recognize property interest protected by Due Process Clause of the Fourteenth Amendment in police enforcement of terms of restraining order); *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189 (1989) (declining to recognize that substantive component of Due Process Clause of the Fourteenth Amendment requires that state protect life, liberty or property of its citizenry from invasion by private actors).

1.    **As the summary judgment record contains no evidence that Sullivan observed the unreasonable use of force, there can be no liability for failure to intervene.**

A necessary requirement in order to sustain a claim that an official failed to intervene in another official's unreasonable use of force is adequate evidence that the bystander actually witnessed the use of illegal force. *See Davis*, 264 F.3d 102 (officer must have seen use of force in order to attach failure to intervene liability). Here, it is important to begin by noting that the most serious use of force allegations, namely, the claims that Moriarty repeatedly struck the Plaintiff with his flashlight (Compl. ¶¶ 17, 19), were events that, if they even took place, were not witnessed by Sullivan.[5] Properly excised, all that fairly may be considered as within the range of Sullivan's

---

[5]It comfortably may be assumed that the Plaintiff will contend that what Sullivan did or did not observe are issues of fact proper for determination by the jury. Not so. In order to avoid summary judgment, the Plaintiff must advance *specific* facts, properly supported in the summary judgment record, establishing issues worthy of trial. *See* Fed.R.Civ.P. 56 (e). Therefore, summary judgment is appropriate unless and until the Plaintiff can provide specific and properly supported facts that Sullivan in fact did observe constitutional misconduct.

-8-

observations of the physical contact between Moriarty and the Plaintiff is Sullivan's testimony, uncontradicted in the summary judgment record, that, upon his attention being drawn to the Plaintiff and Moriarty a second time, he saw the men already engaged in mutual combat, in a grappling position with each individual grasping the shirt of the other in the other's chest or shoulder area. (St. of Undisp. Facts, ¶ 20.) It was then that Sullivan made his failed attempt to proceed toward the confrontation, an attempt that was short-circuited by the battery committed upon Sullivan by Vannaraj.[6] (Id., ¶ 22-23.) From that point on, Sullivan was precluded from further material observations of Moriarty and the Plaintiff, or from any further attempt at intercession, by having to defend himself from additional battery and by having to secure Vannaraj in order to place him under arrest.

Sullivan's observations, therefore, consisted entirely of witnessing a brief vignette of the physical confrontation between the Plaintiff and Moriarty, "book-ended" on either side by Sullivan's reasonable ignorance of critical facts. *See Suboh v. District Attorney's Office of Suffolk Co.*, 298 F.3d 81 (1st Cir. 2002) (reversing trial court's denial of summary judgment for prosecutor who was unaware of certain material facts relating to child custody dispute and therefore could not be liable). Because Sullivan's observations of the physical confrontation began after the Plaintiff and Moriarty already had come into physical contact with one another, Sullivan had no knowledge as what had triggered the contact, by whom the contact was initiated or the manner in which the contact was

---

[6] It is significant to note that Sullivan did attempt to move toward the Plaintiff and Moriarty, but his attempt was thwarted by Vannaraj's battery. Curiously, any "failure" by Sullivan to intervene therefore was the immediate consequence of this exigent circumstance of a battery by a third party. It would strain the principles that underlie the notion of failure to intervene liability to attach individual liability upon a bystander whose opportunity to act was prevented by the intervening commission of a criminal act on the bystander at the precise time at which it is alleged that the bystander was failing to intervene.

initiated. Without any knowledge as to critical facts relating to these issues, Sullivan could have no basis to discern whether the limited contact that he observed was Moriarty defending himself from attack, Moriarty trying to bring a resistive subject into control in order to effectuate his arrest, or some other possibility. Moreover, with respect to events that may have taken place after Sullivan's window of observation was slammed shut by Vannaraj's battery, Sullivan was unaware of any facts relating to any such events. In short, the foundational premise for failure to intervene liability is the notion that an official sees the use of force, is or should be aware that the force is improper, and does not act despite a realistic opportunity to intervene. *See Davis*, 264 F.3d 102. It would pervert that justificatory premise to attach liability for a bystander in Sullivan's position, with reasonable ignorance as to critical events taking place prior to his initial observation of physical contact and reasonable ignorance as to critical events taking place after he was prevented from further observations by an intervening criminal act.[7]

**2.    Given the totality of circumstances existing at the time of the alleged failure to intervene, Sullivan did not have a realistic opportunity to intervene.**

Even should this Court determine that Sullivan possessed a base of knowledge sufficient to trigger a duty to intervene; *but see* n.6 (indicating that Sullivan did attempt to move toward the confrontation); Sullivan nonetheless is entitled to judgment in his favor because the summary

---

[7]This basic point also precludes any argument by the Plaintiff that, because the Plaintiff allegedly had committed no crime, Sullivan's observation of the use of *any* force by Moriarty is sufficient to withstand Sullivan's request for summary judgment. Again, with no context provided for his limited observations, Sullivan reasonably could not know whether he was observing Moriarty defending himself, permissibly attempting to secure a resistive individual once having established probable cause to arrest, or some other possibility. It is not enough for the Plaintiff to provide facts that Sullivan observed force being used, the Plaintiff, in order to withstand summary judgment on this claim, bears the burden of providing specific facts establishing a triable issue; Fed.R.Civ.P. 56 (e); which, here, means providing facts that Sullivan observed constitutional misconduct and failed to act.

judgment record leads ineluctably to the conclusion that, at the time of the alleged failure, Sullivan did not possess any realistic opportunity to intervene. In prior cases considering failure to intervene claims, this Court and the First Circuit have focused the realistic opportunity inquiry upon several factors, including: (1) the suddenness with which the use of force began; *Noel v. Town of Plymouth*, 895 F.Supp. 346, 352 (D.Mass. 1995); (2) the temporal duration of the force; *Gaudreault*, 923 F.2d at 207 n.3 (no liability when attack "was over in a matter of seconds"); *see also Noel*, 895 F.Supp. at 352-53 ("the plaintiff's purported injuries are most consistent with a scuffle of quick duration, involving a blow to the face followed by a blow to the back" and, therefore, several bystanders "had no realistic opportunity to intervene...."); and, (3) the physical proximity of the bystander to the use of force. *Davis*, 263 F.3d at 104 (proximity of three feet deemed sufficient distance to intervene, when evidence presented that another individual at greater distance did intervene). As applied in this instance, each of these factors counsels in favor of a determination that Sullivan had no realistic opportunity to intervene.

First, the commencement of physical contact between Moriarty and the Plaintiff was abrupt. In the words of the Plaintiff, the contact "came so fast. Because I never thought he would have hit me. . . .It happened so fast." (Ex. C, pp. 77-78.) Similarly, the Plaintiff's brother, Somphet Khakeo, has testified that, after observing the verbal interaction between the Plaintiff and Moriarty, the "next thing" he knew, the Plaintiff was on the ground in a rapidly occurring sequence of events. (Ex. D, pp. 45-46.) Although, as explained, Sullivan did not see the initiation of physical contact between Moriarty and the Plaintiff, the fact that Sullivan did observe the two verbally engaged with one another, had his attention directed back to the large gathering in front of him and, upon having his attention drawn to Moriarty and the Plaintiff a second time, observed mutual combat, also is a sequence tending to suggest a physical confrontation that began abruptly. By all accounts, this

-11-

physical confrontation was both "sudden" and "momentary." *Noel*, 895 F.Supp. at 352.

Second, with respect to the temporal duration of the confrontation, it is again critical to calculate appropriately the time period at issue. This calibration necessarily must exclude any events occurring prior to Sullivan becoming aware of a physical confrontation between Moriarty and the Plaintiff, for the simple reason that one cannot be said to have a duty to intervene in a situation that one is not aware is taking place. It also must exclude any events taking place once any opportunity for Sullivan to intervene was brought to an end by the exigent circumstance of Vannaraj's battery. Realistically, Sullivan cannot intervene in a physical confrontation taking place some distance away at the same time that he is trying to defend himself from further attack and bring a subject under arrest. Once framed properly, the record is clear that the time period at issue was extraordinarily short. Indeed, beginning with his initial observation of mutual combat, Sullivan had time only to recognize the contact and to take initial steps in the direction of this confrontation before his capacity to intervene was brought to an end by Vannaraj's battery. Such a time frame is dissimilar to instances in which bystanders observe a physical confrontation for a prolonged period and do not act, and rather is akin to a "scuffle of quick duration," for which failure to intervene liability is entirely inappropriate. *See Gaudreault*, 923 F.2d at 207 n.3 (no liability when "attack came quickly and was over in a matter of seconds"); *O'Neill*, 839 F.2d at 11 (cited with approval in *Gaudreault* and *Davis*) ("The three blows were struck in such rapid succession that [the bystander officer] had no realistic opportunity to attempt to prevent them."); *Jesionowski*, 937 F.Supp. at 104-105 (two quick successive blows did not give bystander adequate time to intervene); *Noel*, 895 F.Supp. at 352-53 (allegations of two quick strikes were consistent with "scuffle of quick duration," for which failure to intervene liability could not attach).

Third, the developed summary judgment record also reveals that, at the relevant time,

Sullivan was not in sufficient proximity to the Plaintiff and Moriarty to have been able to intervene physically. Specifically, the Plaintiff has testified that, at the operative point in time, Sullivan was "way out to [his] left," too far away for the Plaintiff even to be able to see Sullivan well enough to provide a physical description. (Ex. C, p. 161.) The Plaintiff estimated Sullivan's location to be approximately twelve to fifteen feet away from the confrontation, with a table separating that spot from Sullivan's location. (Id., 163.) In turn, Moriarty has provided an estimate of twelve to fifteen feet; (Ex. B, p. 47); while Sullivan himself has approximated the distance as at least ten feet. (Ex. A, ¶ 23.) Given the suddenness of this confrontation, the limited time frame from Sullivan's initial observation of physical contact to the intervening and extraordinary event of Vannaraj's battery, as well as the other circumstances then existing, including an alchohol-fueled environment filled with a large number of individuals, some of whom were unruly and virulent in their actions toward the officers, Sullivan was not in a position to intervene physically. *Compare Davis*, 264 F.3d at 104 (affirming jury verdict of liability when bystander was within three feet of the use of force and evidence presented that bystander at greater distance away did respond).[8]

---

[8]An additional point counseling of favor of summary judgment is § 1983's explicit requirement that a plaintiff demonstrate a causal link between the challenged governmental conduct and the claimed deprivation of rights, privileges or immunities. 42 U.S.C. § 1983 ("Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, *subjects, or causes to be subjected*, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable . . . .") (Emphasis added); *see also Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978). This cause-in-fact requirement applies regardless as to whether the governmental conduct at issue is an affirmative action or a challenged omission. *See Fernandez v. Chardon*, 681 F.2d 42 (1st Cir. 1982), *affirmed on other grounds sub nom. Chardon v. Fumero Soto*, 462 U.S. 650 (1983). In the context of failure to intervene cases, commentators have recognized the difficulty in sustaining this required causation burden in order to sustain a claim. *See* Sheldon H. Nahmod, CIVIL RIGHTS AND CIVIL LIBERTIES LITIGATION: THE LAW OF SECTION 1983, Vol. I, § 3:110, p. 3-384 ("In most § 1983 cases, showing a causal relation between defendant's conduct and the violation of plaintiff's constitutional rights poses no serious problem to the plaintiff. However,

-13-

## C.    QUALIFIED IMMUNITY

Sullivan also is entitled to summary judgment in his favor for an additional, compelling

reason: he is shielded from liability by virtue of the doctrine of qualified immunity.  With the

undisputed material facts as the foundation, the issue of qualified immunity presents a question of

law that is entirely appropriate for judicial determination at this time, given the emphasis that has

been placed on the importance of a decision on the issue "at the earliest possible stage in [the]

litigation," because the defense is "an entitlement not to stand trial or face the other burdens of

litigation" and "the costs and expenses of trial are [to be] avoided where the defense is dispositive."

*Saucier v. Katz*, 533 U.S. 194, 200-201 (2001) (citations omitted); *see also Tatro v. Kervin*, 41 F.3d

9, 15 (1ˢᵗ Cir. 1994) ("Qualified immunity . . . is an issue that is appropriately decided by the court

during the early stages of the proceedings and should not be decided by the jury.").

Qualified immunity analysis consists of a familiar trifurcated inquiry.  *Hatch v. Department*

*for Children, Youth & Their Families*, 274 F.3d 12, 20 (1ˢᵗ Cir. 2001).  Analysis begins with an

evaluation as to whether a plaintiff has alleged sufficiently the deprivation of a constitutional right in

the first instance.  *Saucier*, 533 U.S. at 201; *McIntyre*, 336 F.Supp. at 101.  Second, the Court is to

consider whether the particular constitutional right at issue was established clearly, in that the

contours of that right were delineated sufficiently, at the time of the deprivation.  *Saucier*, 533 U.S.

---

some rather difficult cause-in-fact questions may arise in those § 1983 cases where it is alleged
that the defendant acted or failed to act to prevent the violation of plaintiff's constitutional rights
*by others*.") (Emphasis in original).  Here, the Plaintiff has no reasonable expectation of
demonstrating that Sullivan's purported failure to intervene *caused* any deprivation of the
Plaintiff's invoked constitutional rights.  Put simply, unless the Plaintiff can articulate specific
facts that Sullivan's alleged failure caused any constitutional deprivation, such as a
demonstration that anything that Sullivan reasonably could have been expected to do could have
succeeded in forestalling the asserted constitutional deprivation, the Plaintiff cannot meet the
burden imposed by this essential element, and, having failed to raise a trialworthy issue on an
essential element, Sullivan is entitled to summary judgment in his favor.

at 201-202. Put another way, the Court evaluates "whether the right was reasonably well settled at the time of the challenged conduct and whether the manner in which the right related to the conduct was apparent." *Martinez*, 54 F.3d at 988 (citation omitted). After all, "courts may neither require that state actors faultlessly anticipate the future trajectory of the law . . . nor permit claims of qualified immunity to turn on the eventual outcome of a hitherto problematic constitutional analysis." *Id.*, 988-89 (citations omitted). Third, the inquiry proceeds to an analysis as to whether, considered objectively, the deprivation at issue was such that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.

Cast more broadly, the touchstone for qualified immunity is the objective legal reasonableness of the official's conduct, given the clearly established constitutional understandings then existing, as well as the information possessed by the official at the time of the challenged conduct. *Lowinger v. Broderick*, 50 F.3d 61, 65 (1st Cir. 1995); *Crooker v. Metallo*, 5 F.3d 583, 585 (1st Cir. 1993). "The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. It is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts. . . . If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense." *Saucier*, 533 U.S. at 205; *see also Anderson v. Creighton*, 483 U.S. 635, 641 (1987) (defense of qualified immunity allows for inevitable reality that "law enforcement officials will in some cases reasonably but mistakenly conclude that [their conduct] is [constitutional] and . . . that . . . those officials–like other officials who act in ways they reasonably believe to be lawful–should not be held personally liable."). The doctrine applies with equal force regardless as to whether the officer's reasonable mistake is one of law, one of fact, or a mistake based upon mixed questions of law and fact. *Butz v. Economou*, 438 U.S. 478, 507 (1978). Not

surprisingly, the doctrine of qualified immunity applies with exceptional strength in fast-paced and

dangerous settings, in which an official will be immune unless it is obvious that no reasonably

competent officer could have made the same choice in circumstances that assuredly were tense,

uncertain, and rapidly evolving. *Roy v. Inhabitants of the City of Lewiston*, 42 F.2d 691, 695 (1st

Cir. 1994); *see also Malley v. Briggs*, 475 U.S. 335, 341 (1986) (defense "provides ample protection

to all but the plainly incompetent or those who knowingly violate the law").

Here, Sullivan's argument that, under the appropriate constitutional framework, the Plaintiff

has failed to prove sufficiently the deprivation of any constitutional right for which Sullivan may be

liable is contained within Sections II.A. and II.B. of this Memorandum.  To the extent that this Court

concludes that the Plaintiff adequately has proven the deprivation of a constitutional right that

causally may be linked to Sullivan, Sullivan nevertheless is entitled to the protection from liability

afforded by qualified immunity based upon analysis under the remaining stages of the inquiry.

Initially, it is helpful to parse the nature of the Plaintiff's failure to intervene claim in order to

facilitate an appropriate qualified immunity analysis.  At bottom, the Plaintiff's claim relies upon

two related, yet analytically distinct, assertions, specifically, that Sullivan is liable for having failed

to intercede: (1) physically in the confrontation between Moriarty and the Plaintiff; and, (2) by way

of verbal directive to Moriarty to immediately terminate physical contact with the Plaintiff.  With

that conceptual distinction in mind, the remainder of the qualified immunity analysis may proceed.

1.      **Given the totality of circumstances existing at the time of the alleged failure to
        intervene, the contours of the Plaintiff's asserted constitutional right were not
        established clearly, insofar as the manner in which the right applied to the
        situation was not well established.**

Within the second stage of the qualified immunity analysis, the necessary inquiry for this

Court "focuses not upon the right at its most general or abstract level, but at the level of its

-16-

application to the specific conduct being challenged." *McIntyre*, 336 F.Supp.2d at 101 (citations and quotation marks omitted). Although prior precedent that is precisely on point with the factual predicate presented in the object of inquiry is not necessary in order to conclude that a right was established clearly at the time of the challenged conduct; *see Hope v. Pelzer*, 536 U.S. 730, 741 (2002); "[t]he defense of qualified immunity applies unless the law is clearly established either by materially similar precedent or by general legal principles that apply with obvious clarity to the facts of the case." *McIntyre*, 336 F.Supp.2d at 123. In essence, officials cloaked with qualified immunity have a right to "fair" notice from existing case law that *particular* conduct is proscribed and that engaging in such conduct carries the consequence of defeating the protections conferred by the doctrine. *See Hope*, 536 U.S. at 739-40.

Beginning with the variant of the Plaintiff's claim asserting that Sullivan is liable for having neglected to intercede physically in the confrontation between the Plaintiff and Moriarty, as referenced earlier, there simply was no precedent, even of a remotely similar nature, that could have provided any reasonable officer in Sullivan's position with notice that liability could attach when the officer's ability to intervene was foreclosed by a battery on that officer at the same time as the alleged failure to intervene. Indeed, there exists no such fair notice in relevant case law even as of this date, an unsurprising fact given the disconnect of such a proposition from common sense and rational legal principle. Placed within the context of the failure to intervene standard, it can be said without equivocation that a bystander, himself the victim of a battery by a third party and engaged with that third party in attempting to defend himself from further attack and effectuating the arrest of that individual, has no realistic opportunity to intervene in a physical confrontation involving other individuals taking place simultaneously some distance away, and also has no fair notice that the failure to intervene in such a setting may trigger individual liability.

-17-

With respect to the variant of the claim asserting that Sullivan is liable for having failed to

intercede by way of verbal directive to Moriarty, as of September 9, 2001, the time of the alleged

failure, no reasonably aware official similarly situated to Sullivan had any fair notice that a failure to

intervene verbally could operate as a constitutional deprivation.  Critically, as of that date, the

**overwhelming** weight of case law on the issue of liability for an official's failure to intervene in

another official's use of unreasonable force focused, unwaveringly, on that bystander's failure to

intervene physically. *See, e.g., Gaudreault*, 923 F.2d at 203 n.3; *Jesionowski*, 937 F.Supp. at 104-

105; *Noel*, 895 F.Supp. at 352-53.

Indeed, the first occasion on which the First Circuit expressly premised a determination of

liability for an official's failure to intervene verbally in the use of force by another official was *Davis*

*v. Rennie*, 264 F.3d 86 (1st Cir. 2001).  In *Davis*, a defendant nurse in a state hospital was alleged to

have failed to intervene in another hospital worker's unreasonable use of force, in which that worker

had punched an involuntarily committed mental patient several times in the head while the patient

was restrained. *Id.*, 91, 94, 96.  After a jury found the defendant nurse liable for failure to intervene;

*id.*, 96; an appeal followed in which the defendant nurse claimed that she, as a mere supervising

nurse, did not have the same duty to intervene physically that other hospital workers or security

personnel possessed in such a situation. *Id.*, 104.  Responding to that claim, the First Circuit

appeared to agree with the notion that a nurse's duty to intervene physically did not exist, or at least

existed to a diminished extent, as compared to security personnel, but indicated that liability

nevertheless could attach because the defendant nurse "could have intervened simply by calling to

[the official engaged in the use of force] to stop." *Id.*[9]

---

[9]As support for the proposition, the First Circuit relied on a single decision of the Sixth
Circuit, *Durham v. Nu'Man*, 97 F.3d 862, 868 (6th Cir. 1996), that similarly had held that a state

The *Davis* decision, the First Circuit's initial foray into the realm of failure to intervene by way of verbal directive, was issued on September 5, 2001—a scant four days before the events at issue in this litigation. Although a law enforcement officer has a duty to remain apprised of developments in relevant case law, it is patently unreasonable to conclude that an officer should be found liable for having failed to intervene on a Sunday, when the only precedent within the Circuit related to such a set of circumstances was issued the previous Wednesday. As mentioned, the doctrine of qualified immunity is centered upon the notion that officials are entitled to "fair notice" as to what conduct is proscribed, such a principle necessarily excludes a situation in which a novel legal principle was minted four days prior to the challenged conduct.

Moreover, this point—that it is emphatically not the province of law enforcement officers to check newly-issued appellate decisions minting novel legal principles on a daily basis—even presumes that which is not necessarily assumable in this instance: that a reasonable law enforcement official reading the *Davis* decision in the extraordinarily brief window between September 5, 2001 and September 9, 2001 should have interpreted the decision as applicable to the law enforcement context. *See Martinez*, 54 F.3d at 988-89 (citations omitted) (noting that government officials are not "expected to carry a crystal ball"). In this regard, it is not just a distinction between job title—that of nurse in a state mental hospital and law enforcement official—that is critical, but it is the manner in which the First Circuit's analysis in *Davis* proceeded that must be kept in mind. Preceding its substantive discussion, the *Davis* Court set the landscape for analyzing the claims presented thusly: "[f]or involuntarily committed patients, '*a set of unique rules has developed*' according to which 'failures to act . . . may comprise a due process or other constitutional violation because the state-

_____

nurse who watched while hospital security personnel beat an involuntarily committed mental patient could be found liable for having failed to direct the officers to stop the attack.

imposed circumstance of confinement prevents such individuals from helping themselves." *Davis*,

264 F.3d at 98 (emphasis added). It is within that "unique context" that the First Circuit went on to

conclude that the defendant nurse could be liable for her neglect in failing to intercede by way of

verbal directive, and it is that context that distinguishes the setting of a mental hospital, with nurses

peculiarly charged with maintenance of the well-being of involuntarily committed mental patients,

from the setting of an arrest of an individual by law enforcement officials on the street. Viewed

objectively, *Davis*, by itself, would not have provided a reasonable official in Sullivan's position

with the fair notice necessary in connection with a duty to intervene verbally, assuming even

adequate opportunity to have become apprised of the decision. Indeed, given the situational

dissimilarity of *Davis* compared to the law enforcement setting, today *Davis* may not even be

considered as providing adequate notice to law enforcement officials of potential liability for verbal

failure to intervene; certainly it did not do so within four days of the issuance of the opinion.[10]

---

[10]Relatedly, on the subject of fair notice, there is an additional point worthy of mention that distinguishes the facts presented here from just about every other setting in which a failure to intervene claim has arisen within the First Circuit, and that extinguishes potential individual liability for Sullivan as a matter of law. Reviewing the various failure to intervene decisions, whether issued by this Court or the First Circuit, a common factual thread emerges. In those earlier cases, failure to intervene claims generally are advanced against a government official when that official failed to intervene in a factual setting in which the civilian victim of unreasonable force is outnumbered by government actors, including both those who engaged in the use of force and those who failed to intervene. *See, e.g., Wilson*, 294 F.3d at 4, 14 (three officers involved); *Davis*, 264 F.3d at 93 (eight officials involved); *Gaudreault*, 923 F.2d at 207 n.3 (four officers alleged to have failed to intervene while an unidentified fifth officer attacked); *Jesionowski*, 937 F.Supp. at 98-99, 104-05 (failure to intervene claim against one officer while two alleged to have engaged in use of force); *Noel*, 895 F.Supp. at 349 (six officers present). In a situation in which a civilian victim is outnumbered, as much as eight to one, by government actors, and in which one or more actors unreasonably apply force while others observe it and fail to act, it is eminently reasonable that the bystanders be liable for their failure, because of the factual construct of that setting, including the relative place of security from which the actors could have intervened. In stark contrast, the facts presented here involve the opposite–two officers outnumbered, by an extraordinarily large margin, by the civilians on scene. Accordingly, the same sense of relative security that would compel an official to intervene in another setting,

**2.    Qualified immunity precludes liability for Sullivan because it would not have been clear to a reasonable official in his position that his conduct was improper.**

Proceeding to the third stage of analysis, Sullivan should be granted summary judgment on the basis of qualified immunity because, given the situation existing at the time of his alleged failure to act, it would not have been clear to any reasonable official that a failure to act in that setting could trigger liability. *See Saucier*, 533 U.S. at 202. As explained in greater depth in Sections II.A., II.B. and II.C.1., given Sullivan's reasonable ignorance of critical facts, the exigencies with which he was faced, including Vannaraj's battery and Sullivan's subsequent actions carried out in self-defense, as well as status of relevant case law as then existing, Sullivan is entitled to qualified immunity with regard to the Plaintiff's failure to intervene claim because, in tense, uncertain and rapidly evolving circumstances, Sullivan's conduct was both necessary and objectively reasonable, and the contrary would not have been apparent to any reasonable official similarly situated. *Roy*, 42 F.2d at 695.

**III.    COUNT IV (§ 1983 Supervisory Liability)**

Count IV of the Complaint alleges that Sullivan failed to supervise Moriarty adequately, thereby tacitly condoning Moriarty's alleged unreasonable use of force, unlawful arrest and retaliation in violation of the Plaintiff's First Amendment freedoms. (Compl. ¶¶ 43-46.) As to this count, Sullivan is entitled to summary judgment in his favor.

It is well settled that, in the context of a § 1983 supervisory claim, a supervisor may be liable "only on the basis of his [or her] own acts or omissions." *Noel*, 895 F.Supp. at 351; *see McIntyre*, 336 F.Supp.2d at 127 (vicarious liability inapplicable in § 1983 context). Moreover, "[t]o be actionable as a constitutional violation, the offending conduct of the supervisor must manifest, at a

---

and trigger liability for failure to do so, is not present in this situation and the justificatory principle for liability also should not apply.

minimum, a deliberate indifference to the constitutional rights [of a plaintiff]. . . . To plead

deliberate indifference, a plaintiff must allege '(1) a grave risk of harm; (2) the [supervisor's] actual

or constructive knowledge of that risk; and (3) his [or her] failure to take easily available measures

to address the risk." *McIntyre*, 336 F.Supp.2d at 127 (citations omitted).  In addition, a plaintiff

bears the burden of demonstrating "an 'affirmative link' between the street-level misconduct and the

action, or inaction, of supervisory officials."  *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 562

(1st Cir. 1989) (citations omitted).

The Plaintiff's limited supervisory liability claim[11] is entirely derivative of his failure to

intervene claim and, for the reasons provided within Section II of this Memorandum, including the

application of the doctrine of qualified immunity, fails as a matter of law.  Put another way,

summary disposition is appropriate because Sullivan cannot be liable for allegedly having failed to

supervise a subordinate adequately when that supervisory allegation is inextricably intertwined,

factually and legally, with a failure to intervene claim that itself fails as a matter of law.  Moreover,

to the extent that this supervisory liability claim requires a threshold showing of facts meeting the

high standard of deliberate indifference to the constitutional rights of the Plaintiff, the Plaintiff's

claim of supervisory liability falls faster than the failure to intervene claim, because the Plaintiff has

no evidence to support a contention that Sullivan was aware, actually or constructively, of a grave

---

[11]The Plaintiff's supervisory liability claim is of limited scope, insofar as it is centered entirely upon the incident of September 9, 2001, and Sullivan's alleged failure to supervise during that discrete incident.  The Plaintiff has not advanced a broader supervisory claim, for instance alleging that Sullivan otherwise "supervise[d], train[ed], or hire[d] [Moriarty] with deliberate indifference toward the possibility that deficient performance of the task eventually may contribute to a civil rights deprivation." *McIntyre*, 336 F.Supp.2d at 127 (collecting cases finding deliberate indifference by supervisors when supervisor permitted reinstated officer to carry weapon without reviewing officer's record, failed to keep violent police officer confined to desk job and knowingly failed to remedy pattern of unconstitutional conduct).

risk of harm to the Plaintiff and that, while in the midst of tending to an unruly crowd, becoming the

victim of a battery and defending himself from further battery, he failed to take easily available

measures to address that risk to the Plaintiff. *McIntyre* 336 F.Supp.2d at 127.

## IV.    COUNT VI (STATE CIVIL RIGHTS ACT)

Count VI of the Complaint alleges that Sullivan violated the Plaintiff's "rights by threats,

intimidation and coercion," rendering Sullivan liable pursuant to M.G.L. ch. 12, § 11I ("the

MCRA"). Sullivan is entitled to an entry of summary judgment in his favor as to this claim, again

entirely derivative of the Plaintiff's § 1983 failure to intervene claim. *See* Sections II and III.[12]

In order to sustain a MCRA claim, a plaintiff must be able to demonstrate, by a

preponderance of the evidence, that a defendant used "threats, intimidation, or coercion" to interfere,

or to attempt to interfere, with the plaintiff's exercise of rights secured by either federal or state law.

M.G.L. ch. 12, §§ 11H-I; *Brum v. Town of Dartmouth*, 428 Mass. 684 (1999).[13] As compared to a §

---

[12]"The same qualified immunity standard that applies under § 1983 [also has] been held
to apply to claims under the MCRA." *Kelley v. LaForce*, 288 F.3d 1, 10 (1st Cir. 2002) (citation
omitted). Therefore, for the same reasons as advanced in Section II.C. of this Memorandum,
Sullivan is shielded from MCRA liability by qualified immunity and is entitled to summary
judgment in his favor as to Count VI.

[13]In *Planned Parenthood League of Massachusetts, Inc. v. Blake*, 417 Mass. 467, 474
(1994), the Massachusetts Supreme Judicial Court authoritatively defined the operative statutory
terms of the MCRA:

> 'Threat' . . . involves the intentional exertion of pressure to make
> another fearful or apprehensive of injury or harm. 'Intimidation'
> involves putting in fear for the purpose of compelling or deterring
> conduct. ['Coercion' is] 'the application to another of such force,
> either physical or moral, as to constrain him to do against his will
> something he would not otherwise have done.' (Citations omitted.)

Given the nature of these definitions, violations of the MCRA typically involve "actual or
potential physical confrontation accompanied by a threat of harm. . . ." *Id.*, 473; *see also Bally v.
Northeastern Univ.*, 403 Mass. 713, 719-20 (collecting cases). Although the Supreme Judicial
Court also has found that cancellation of a contract securing future economic gain, when tied to
the exercise of a constitutional right, can constitute coercion for MCRA purposes; *Redgrave v.*

1983 claim, the additional requirement under M.G.L. ch. 12 § 11I that the interference, or the attempted interference, occur by means of "threats, intimidation or coercion" means that a deprivation of a right without such threats, intimidation or coercion, cannot serve as the basis for liability. *Longval v. Commissioner of Correction*, 404 Mass. 325 (1989); *see also Broderick v. Roache*, 803 F.Supp. 480, 486 (D.Mass. 1992) ("essential element" of MCRA violation is evidence of threats, intimidation or coercion and there must be, in addition to a deprivation, "something akin to duress which causes the victim to relinquish her rights." (Citation omitted.)). Whether a statement or action is to be considered a "threat," or constitute "intimidation" or "coercion," is to be measured objectively. *Sarvis v. Boston Safe Deposit and Trust Co.*, 47 Mass.App.Ct. 86 (1999), *rev. denied* 430 Mass. 1106.

Briefly, and without factual elaboration, the Complaint claims that Sullivan interfered with certain of the Plaintiff's rights by means of threats, intimidation or coercion. Such an oblique assertion, by itself, is insufficient to survive summary judgment. *See* Fed.R.Civ.P. 56 (e); *see also Correa-Martinez v. Arrillaga-Belendez*, 903 F.2d 49, 52 (1st Cir. 1990) (in evaluating motion to dismiss, court is not obliged to credit "bald assertions, periphrastic circumlocutions [or] unsubstantiated conclusions"); *Columbus v. Biggio*, 76 F.Supp.2d 43, 54 (D.Mass. 1999) (dismissing claim under MCRA for failure to allege sufficiently that constitutional deprivations were brought about by threats, intimidation or coercion).

Moreover, the Plaintiff's MCRA claim is entirely derivative of the Plaintiff's failure to intervene claim that, for the reasons set forth in this Memorandum, fails as a matter of law. Indeed,

---

*Boston Symphony Orchestra, Inc.*, 399 Mass. 93 (1987); *see also Buster v. George W. Moore, Inc.*, 438 Mass. 635 (2003) (economic coercion may be actionable under the MCRA); this variant of coercive action is plainly not at issue here.

-24-

as was the case with the supervisory liability claim, the lack of viability with respect to this MCRA

claim is an easier question to resolve in favor of Sullivan because the MCRA demands the more

exacting elemental threshold of challenged conduct constituting threats, intimidation or coercion.

*Batchelder v. Allied Stores Corp.*, 393 Mass. 819, 822-23 (1985). On this point, the developed

summary judgment record does not reveal a modicum of evidence that Sullivan either engaged in

any conduct that reasonably may be understood as threatening, intimidating or coercive, or evidence

tending to suggest that Sullivan directed Moriarty to engage in such conduct. Indeed, a failure to

intervene claim, a notion of liability premised upon the official's *failure* to act, by its very nature

belies the proposition that the official's conduct could constitute the threatening, intimidating or

coercive behavior required for MCRA liability.

## V.    CONCLUSION

Wherefore, Sullivan respectfully requests an entry of summary judgment in his favor as to

each of the remaining counts in the Complaint.

> Kevin Sullivan
> By his attorneys,
>
> /s/Andrew J. Gambaccini
> Austin M. Joyce, BBO # 255040
> Andrew J. Gambaccini, BBO # 654690
> REARDON, JOYCE & AKERSON, P.C.
> 397 Grove Street
> Worcester, MA 01605
> (508) 754-7285