## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **PHAYSANH KHAKEO,** : | |
| **Plaintiff,** : | |
| : | |
| **v.** : | **C.A. 04-11941-RWZ** |
| : | |
| **DENNIS MORIARTY and** : | |
| **KEVIN SULLIVAN, in their** : | |
| **individual capacities and** : | |
| **the CITY OF LOWELL,** : | |
| **Defendants.** : | |

## DEFENDANT KEVIN SULLIVAN'S STATEMENT OF UNDISPUTED MATERIAL FACTS SUBMITTED IN COMPLIANCE WITH LR, D.Mass. 56.1

Defendant Kevin Sullivan, by and through his undersigned counsel and pursuant to LR, D.Mass. 56.1, hereby submits the following with regard to a statement of undisputed material facts in support of his request for summary judgment:

1.      Sullivan currently is employed as a Lieutenant with the City of Lowell Police Department, having served in that rank since 1999, and having served the City of Lowell as a law enforcement officer since 1992. Previously, from 1987 through 1992, Sullivan served the Town of Westford as a law enforcement officer. (Affidavit of Kevin Sullivan, appended hereto and marked as "Exhibit A," ¶ 2.)

2.      In September, 2000, Sullivan was assigned to the position of Officer-in-Charge of the Community Response Unit of the Lowell Police Department. This Community Response Unit was charged with the task of providing assistance to the Lowell Police Department Patrol Unit on any matter of significance taking place within the City. As a general

-1-

matter, the majority of the Community Response Unit's efforts were focused upon dealing with the City's substantial gang problems. (Exhibit A, ¶ 4-5.)

      3.      On September 9, 2001, Sullivan was working the 4 p.m. to 12 a.m. shift, was clad in a full Lowell Police Department uniform and was operating a marked Lowell Police Department cruiser. (Exhibit A, ¶ 6.)

      4.      Also on September 9, 2001, Defendant Dennis Moriarty of the Lowell Police Department was working the 4 p.m. to 12 a.m. shift in plainclothes. Moriarty's function at the beginning of that shift was to conduct surveillance as to potential gang activity in various areas of Lowell, and to report any pertinent observations to other members of the Community Response Unit. (Exhibit A, ¶ 6; Deposition of Dennis Moriarty, appended hereto and marked as "Exhibit B," pp. 17-21.)

      5.      At some point that evening, Moriarty ended his surveillance activities and joined Sullivan in Sullivan's marked police cruiser in order to carry out patrol duties. (Exhibit A,¶ 6; Exhibit B, pp. 22-23.)

      6.      Shortly after 7 p.m. that evening, a radio transmission was broadcast, directing Lowell Police units to the area of 125 Grand Street in Lowell in order to respond to a report that there was a large group of Asian individuals fighting in the street with baseball bats and machetes. (Exhibit A, ¶ 7; Exhibit B, p. 26.) At that time, beyond the inherent danger associated with a brawl involving a number of individuals with weapons, Sullivan knew that the report was especially serious, as he was aware of prior incidents in that area of Grand Street that had involved weapons. (Exhibit A, ¶ 8.)

      7.      Sullivan proceeded to this call, activating his cruiser lights and turning

-2-

onto Chelmsford Street–a public way in Lowell that intersects, in a "T" fashion, Grand Street in the vicinity of the reported riotous fight. (Exhibit A,¶ 9; Exhibit B, pp. 26-27.)

8.      As Sullivan proceeded down Chelmsford Street toward Grand Street, both he and Moriarty observed male Asian individuals running on the sidewalk, in the direction of Sullivan's cruiser and away from the area of Grand Street. (Exhibit A, ¶ 10; Exhibit B, pp. 28-29.)

9.      Demonstrating how close this location was to the reported fight, marked Lowell Police Department cruisers and uniformed officers were visible from Sullivan's cruiser at the intersection of Grand Street and Chelmsford Street. (Exhibit B, pp. 27-28.)  In fact, Sullivan later would be advised by Officer Mike McCann of the Lowell Police Department that Officer McCann was at the intersection of Grand and Chelmsford Streets and, seeing Sullivan's cruiser and the fleeing males, was gesturing toward the cruiser to detain the individuals. (Exhibit A, ¶ 11.)

10.      Suspicions reasonably aroused by these individuals fleeing the area of the reported brawl, Sullivan and Moriarty then observed the males turn into a paved driveway area located between two buildings, disappearing from the view of Sullivan and Moriarty. (Exhibit A, ¶ 11-12; Exhibit B, p. 29.)

11.      Sullivan brought his marked cruiser to a stop at the sidewalk near this paved driveway area, situated at or about 115 Chelmsford Street. Moriarty exited the cruiser first and, as the passenger side of the cruiser was closest to the driveway area, entered the driveway area first. (Exhibit A, ¶ 13; Exhibit B, p. 30.)

12.      This driveway area at 115 Chelmsford Street was a paved location, enclosed on three sides by buildings, with the only means of public access the avenue by which Sullivan,

-3-

Moriarty and the fleeing Asian males had entered. (Exhibit A, ¶ 14.)

13.     As Sullivan entered the enclosed area, he saw that Moriarty had detained three

male individuals against the wall to the immediate left of the driveway area and observed that

Moriarty was conducting a pat frisk to determine if the individuals were carrying weapons and

whether they had any involvement in the large fight around the corner. (Exhibit A, ¶ 15; Exhibit

B, pp. 31-33.)

14.     Looking deeper into the enclosed area, Sullivan observed a number of parked

vehicles, tables, a television, bottles of beer and a large group of individuals gathered in this

enclosed space. (Exhibit A, ¶ 16.)

15.     As Moriarty appeared to have the detention of the three individuals under control,

Sullivan, walking behind Moriarty, proceeded deeper into the enclosed area and toward the large

group of gathered individuals, in order to explain why he and Moriarty were at the location and

why the three individuals with Moriarty were being detained. (Exhibit A, ¶ 16.)

16.     Sullivan approached the group, verbally indicating the purpose behind the police

presence, stating in substance that they were conducting an investigation into a fight taking place

right around the corner. (Exhibit A, ¶ 17.) As Sullivan made these verbal attempts at

explanation, he was met with loud statements that the police did not belong there and that if there

was a fight down the street, the police should go down the street. (Exhibit A, ¶ 17-18;

Deposition of Phaysanh Khakeo, appended hereto and marked as "Exhibit C," pp. 69-71;

Deposition of Somphet Khakeo, appended hereto and marked as "Exhibit D," pp. 40-42.)

17.     Sullivan continued to explain that the officers were conducting a necessary

investigation related to a large fight around the corner, and that the officers would leave when the

-4-

investigation was concluded. (Exhibit A, ¶ 17-18.) These statements continued to elicit loud,

abusive and profane utterances from the gathered group, including that the officers should "get

the fuck" off the property and that the officers did not "belong here." (Exhibit A, ¶ 17-18;

Exhibit B, pp. 36-40.) One member of the group was particularly loud and abusive, a male

individual wearing a St. Louis Rams football jersey, later identified as the Plaintiff's brother,

Somphet Khakeo. (Exhibit A, ¶ 17; Exhibit B, pp. 36-37.)

18.     As the virulence from members of the group continued, Sullivan increasingly

became concerned that the situation would escalate out of control, a peculiar danger insofar as he

and Moriarty were outnumbered by a large margin and many of the potential back-up officers

were engaged with the large brawl down the street. (Exhibit A, ¶ 18.)

19.     As Sullivan continued with his verbal attempts to maintain calm, his attention was

drawn briefly to his left, where he observed the Plaintiff and Moriarty, who by that time had

concluded his investigatory detention of the three individuals, verbally engaged with one another.

(Exhibit A, ¶ 19; Exhibit B, pp. 53-55.) Sullivan's attention then returned quickly to the large

group presenting itself in front of him because, given its large membership and the virulent

statements of its members, at that moment the group represented the primary source of potential

danger to Sullivan and others. (Exhibit A, ¶ 20.)

20.     Thereafter, Sullivan's focus again was drawn to his left, where he observed

Moriarty and the Plaintiff physically engaging each other in a grappling or wrestling position.

(Exhibit A, ¶ 21.) The two men were engaged in mutual combat, each with their hands in the

shoulder or chest area of the other, with a grip on the other's shirt. (Exhibit A, ¶ 21.)

21.     At the time of this observation by Sullivan, Sullivan has estimated that he was

approximately ten feet away from Moriarty and the Plaintiff. (Exhibit A, ¶ 23.) Moriarty has testified that he believes Sullivan's distance was approximately twelve to fifteen feet away. (Exhibit B, p. 47.) In turn, the Plaintiff has testified that he believes that Sullivan was approximately twelve to fifteen feet away, and adds that a table separated Sullivan's position from the positioning of the Plaintiff and Moriarty. (Exhibit C, p. 163.) Interestingly, when questioned as to his observations of Sullivan, the Plaintiff indicated that Sullivan was "way out" to his left, and was too distant for the Plaintiff to see him clearly or to be able to provide a physical description of Sullivan. (Exhibit C, pp. 161-164; 169.)

22.     Despite this distance and physical obstacle, Sullivan turned his body to face the Plaintiff and Moriarty's location, thereby placing the large gathered group of persons to his immediate right, and attempted to proceed toward the Plaintiff and Moriarty. (Exhibit A, ¶ 24.)

23.     Immediately thereafter, Sullivan was struck on the right side of his head by a punch thrown by Inthala Vannaraj, a member of the gathered group. (Exhibit A, ¶ 24-25.)

24.     Having been the victim of a battery on his person, Sullivan promptly seized Mr. Vannaraj and took him to the ground. Sullivan then used his hands and lower body to secure Mr. Vannaraj, while awaiting the arrival of additional officers to assist with the handcuffing and arrest of Mr. Vannaraj, and while yelling loudly at the advancing group of individuals to stay back. (Exhibit A, ¶ 26-28.)

25.     As the Plaintiff, Mr. Vannaraj and Somphet Khakeo, who had continued his riotous behavior and had been arrested for disorderly conduct, were being placed into a police wagon for transport to the station, Sullivan observed the Plaintiff to be bleeding from a cut on his forehead. Sullivan contacted the police dispatcher, advising that an ambulance should be

-6-

contacted and directed to meet the wagon at the station to render medical aid.  (Exhibit A, ¶ 28.)

Kevin Sullivan
By his attorneys,


/s/Andrew J. Gambaccini
Austin M. Joyce
BBO # 255040
Andrew J. Gambaccini
BBO # 654690
Reardon, Joyce & Akerson, P.C.
397 Grove Street
Worcester, MA 01605
(508) 754-7285