UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                          )
PHAYSANH KHAKEO,                          )
           Plaintiff                      )
                                          )
v.                                        )
                                          )
DENNIS MORIARTY,                          )       CIVIL ACTION NO. 04-11941-RWZ
in his individual capacity,               )
KEVIN SULLIVAN,                           )
in his individual capacity,               )
and the CITY OF LOWELL,                   )
           Defendants                     )
_____)

### PLAINTIFF PHAYSANH KHAKEO'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT BY DEFENDANT KEVIN SULLIVAN

The Court should deny Defendant Kevin Sullivan's Motion for Summary Judgment

because Plaintiff Phaysanh Khakeo has produced material evidence showing that Defendant

acted to injure him, making Defendant liable under 42 U.S.C. § 1983 and the Massachusetts

Civil Rights Act (MCRA), and genuine issues of material fact remain vigorously disputed.

Pursuant to Local Rule 56.1, Plaintiff's concise statement of disputed material facts supporting

his Opposition are set out in a separate pleading, filed herewith. Exhibits in Support of Plaintiff's

Opposition to Summary Judgment are attached in a separate pleading, also filed herewith.

### I.    MATERIAL FACTS SUPPORTING PLAINTIFF'S CLAIMS

1.    Lowell Police Department (hereinafter, "LPD") Lieutenant Kevin Sullivan (hereinafter,

      "Lt. Sullivan" or "Defendant") and LPD Officer Dennis Moriarty (hereinafter,

      "Moriarty") were both working the 4 p.m. to midnight shift as part of the Community

      Response Unit ("CRU") on September 9, 2001.  Deposition of Dennis Moriarty

(hereinafter "Pl. Ex. 2") at 4/20-22 & 16/6-8; Affidavit of Kevin Sullivan (hereinafter "Def. Ex. A"), ¶¶ 2 & 4.

2.    The CRU functioned as the "gang unit," whose responsibility it was to deal with "gang related activity," and Moriarty and Lt. Sullivan were familiar with Asian gang members in the Lowell area. Pl. Ex. 2 at 14/17-15/24 & 94/6-9; Deposition of Kevin Sullivan (hereinafter "Pl. Ex. 3") at 18/5-7 & 21/22-22/9; LPD Arrest Report of Physanh Khakeo, Sept. 9, 2001 (hereinafter "Pl. Ex. 4"); Letter from Lt. Paul Laferriere, LPD, to Superintendent Edward Davis III, LPD (Sept. 19, 2001)(hereinafter "Pl. Ex. 5").

3.    By 7 p.m., Moriarty, in plain clothes, and Lt. Sullivan, in full uniform, were in Lt. Sullivan's police cruiser.  Def. Ex. A, ¶ 6; Pl. Ex. 2 at 20/7-8 & 22/10-16.  Around then, a call came over the dispatch radio broadcasting a large fight involving Asian gangs, possibly with bats and machetes, at 125 Grand Street.  Def. Ex. A, ¶ 7, Pl. Ex. 2 at 26/3-9.

4.    Phaysanh Khakeo (hereinafter "Khakeo" or "Plaintiff")[1], an Asian male, then lived with his wife, Phila Khakeo, and their two children, at 115 Chelmsford Street, in Lowell, Massachusetts.  Deposition of Khakeo (hereinafter "Pl. Ex. 6") at 25/7-16 & 157/8-12. Phaysanh Khakeo owned a real estate business at 119 Chelmsford Street, which was located next to 115 Chelmsford Street.  Pl. Ex. 6 at 27/3-4 & 28/7-11.

5.    On Sunday, September 9, 2001, Phila and Phaysanh Khakeo hosted a weekend barbeque for some family and friends in their home; it included children that were approximately

---

[1] The use of "Khakeo" in this Opposition refers to the Plaintiff in this case, Phaysanh Khakeo.  Since other witnesses in this case share the same last name as the Plaintiff, they will be referred to by both their first and last names, *e.g.*, "Somphet Khakeo" and "Phila Khakeo."  If necessary for clarity, Phaysanh's first name will be used.

aged 7, 8, 9, and 10 years old, women and men, many of whom were gathered in their driveway.  Pl. Ex. 6 at 34/22-35/1; Affidavit of Khakeo (hereinafter "Pl. Ex. 7"), ¶ 4.

6.    At around 7 p.m., approximately twenty family members and guests were gathered in the driveway, watching television, eating at the table, and talking.  Pl. Ex. 6 at 43/24 & 61/3-62/3.  Phaysanh Khakeo had recently joined the barbeque after working in his nearby office for most of the day.  Pl. Ex. 6. at 44/1; Pl. Ex. 7, ¶ 3.

7.    Rather than responding to the fight call on Grand Street, Sullivan stopped his cruiser, the "gang unit," on the sidewalk next to the Khakeo residence.  Def. Ex. A at ¶¶ 7 and 12.  Moriarty claimed to observe "numerous Asian males" at 115 Chelmsford Street. Pl. Ex.4.

8.    Moriarty exited the cruiser and entered the driveway.  Pl. Ex. 6 at 67/20-24 & 69/18-23.  Lt. Sullivan followed Moriarty into the driveway.  Pl. Ex. 6 at 68/5-6.

9.    Lt. Sullivan claimed in his police report that he intended to perform an investigatory stop to determine whether anyone at 115 Chelmsford Street had participated in the fight on Grand Street, but, in fact, he did no such investigation.  LPD Arrest Report of Inthala Vannaraj and Somphet Khakeo, Sept. 9, 2001 (hereinafter "Pl. Ex. 8"); Def. Ex. 3 at 32/16-33/5 & 33/24-34/4.  Lt. Sullivan admitted that he failed to get any names or addresses of those present; he did not ask whether anyone had been involved in a fight; he did not investigate to see whether any of them had just been running, *e.g.*, by checking their heart rate; and he did not try to identify the property owner or investigate what kind of a party was going on there.  Pl. Ex. 3 at 32/16-19, 33/3-5, 32/23-33/2 & 33/24-34/4.  Lt. Sullivan and Moriarty testified they did not recognize anyone at the barbeque to be a gang member.  Pl. Ex. 2 at 15/13-24 & 33/13-15; Pl. Ex. 3 at 33/11-23.

3

10.     Moriarty and Lt. Sullivan were the only people who entered or exited the driveway at 115 Chelmsford Street around that time. Pl. Ex. 6 at 68/11-18.

11.     At some point, both Moriarty and Lt. Sullivan demanded that people get up against the wall. *Commonwealth v. Khakeo and Vannaraj*, Nos. 0111CR006131-32 (Mass. Dist. Ct. (Lowell) 2002), Tr. Transcr. vol. I-1 (Dennis Moriarty) (hereinafter "Pl. Ex. 9") at 11/8-9; Pl. Ex. 2 at 35/16-36/8.

12.     Phaysanh Khakeo and his guests were cooperative with the officers and obeyed their commands despite the fact that there was no basis for this police presence at his home. *Com. v. Khakeo and Vannaraj*, Tr. Transcr. vol. II-3 (Phaysanh Khakeo)(hereinafter "Pl. Ex. 10") at 10/18-21, vol. II-7 (Vyrasack Khakeo)(hereinafter "Pl. Ex. 11") at 8/5-14.

13.     Moriarty started questioning Somphet Khakeo, Phaysanh Khakeo's brother, and another individual, possibly Phoumasay Sihanourath or Mounie Noukam. Pl. Ex. 6 at 69/20-71/5; Pl. Phaysanh Khakeo's Ans. to Def. Sullivan's First Set of Interrogs. (hereinafter "Pl. Ex. 12"), No. 7; *Com. v. Khakeo and Vannaraj*, Tr. Transcr. vol. II-10 (Xaykham Kosaketh)(hereinafter "Pl. Ex. 13") at 9/24-10/2. Moriarty asked them what they were doing there. Pl. Ex. 6 at 70/8-14 & 71/13. They said that they were attending a barbeque, and asked what Moriarty was doing there. Pl. Ex. 6 at 71/8-14. Moriarty said there was a fight up the street. Pl. Ex. 6 at 71/15-18. Somphet and the other individual told the officers the only thing happening at 115 Chelmsford Street was a family barbeque and suggested the officers go up the street if there was a fight there. Pl. Ex. 6 at 71/18-21.

14.     Moriarty then got agitated and started yelling for people to "shut the fuck up." Pl. Ex. 6 at 72/9-14; Pl. Ex. 13 at 13/22-23; *Com. v. Khakeo and Vannaraj*, Tr. Transcr. vol. II-12

(Inthala Vannaraj) (hereinafter "Pl. Ex. 14") at 11/8-9.

15.     Phaysanh Khakeo began talking to his brother, trying to calm his brother down in order to help the police and de-escalate the situation.  Pl. Ex. 2 at 50/1-8; Pl. Ex. 6 at 74/3-6.

16.     Despite Phaysanh Khakeo's efforts to keep the situation calm, Moriarty continued swearing at Khakeo's family.  Pl. Ex. 6 at 74/7-11.

17.     At this point, Lt. Sullivan had placed himself between Moriarty and the other guests at the barbeque.  Pl. Ex. 2 at 12/1-2.

18.     Phaysanh Khakeo became concerned with the disrespectful manner with which the police were treating his friends and family, and so he asked Moriarty, "What is your name, sir?"  Pl. Ex. 6 at 73/22-74/14; *Com. v. Khakeo and Vannaraj*, Tr. Transcr. vol. II-6 (Phila Khakeo)(hereinafter "Pl. Ex. 15") at 6/16; *see also* Pl. Ex. 2 at 53/13-16; Pl. Ex.12, No. 7.

19.     This question angered Moriarty, so Moriarty walked over to Phaysanh, who was standing against the wall, and closer to Lt. Sullivan, who was near the table, and he yelled, "Officer Moriarty. What's your fucking name?"  Pl. Ex. 2 at 39/24-40/4 & 47/15-17; Pl. Ex. 6 at 76/4-5; Pl. Ex. 13 at 13/12-19; Pl. Ex. 14 at 9/20-12/13; Pl. Ex. 15 at 8/16-9/2.

20.     Lt. Sullivan admitted that he "observed the Plaintiff and Moriarty... verbally engaged with one another."  Def. Ex. A, ¶ 19.

21.     Phaysanh responded by yelling "Phaysanh Khakeo."  Pl. Ex. 6 at 76/10; Pl. Ex. 12, No. 7.

22.     In response, Moriarty struck him in the stomach with his flashlight, on the bottom of his right ribs.  Pl. Ex. 6 at 76/10-11 & 78/4-9.

23.     Moriarty then struck Khakeo on his left shoulder causing a bruise, after which the impact of the two blows caused Khakeo to lean over towards Moriarty.  Pl. Ex. 6 at 79/1-19.

Moriarty then pushed Khakeo onto the car, face down, and hit him over the head with the flashlight.  Pl. Ex. 6 at 81/24-82/20.

24.   The guests witnessed Moriarty strike Phaysanh Khakeo in the stomach and then strike Phaysanh in the head.  Pl. Ex. 6 at 76/10-11, 78/5-9, and 85/21-23; Pl. Ex. 10 at 11/17-23; Pl. Ex. 11 at 10/14; Pl. Ex. 12, No. 7; Pl. Ex. 13 at 15/20-23; Pl. Ex. 14 at 12/15-17; Pl. Ex. 15 at 6/24-7/2; Deposition of Somphet Khakeo (hereinafter "Pl. Ex. 16") at 49/14-22

25.   Phaysanh never struggled with Moriarty; the attack was completely unprovoked.  Pl. Ex. 6 at 82/21-24; Pl. Ex. 7, ¶ 10.

26.   Lt. Sullivan did nothing to stop Moriarty as the situation escalated by Moriarty swearing at Plaintiff.  Lt. Sullivan failed to intervene either when Moriarty began swearing at Plaintiff or at any point during which Moriarty beat Phaysanh Khakeo.  Pl. Ex. 7, ¶ 9.

27.   During the one-sided physical altercation between Moriarty and Phaysanh Khakeo, Lt. Sullivan was approximately 10 feet behind Moriarty, and he kept himself between the other guests and Moriarty. Def. Ex. A, ¶ 23; Pl. Ex. 6 at 167/21-168/6; Pl. Ex. 9 at 12/1-4.

28.   Xaykham Kosaketh testified at trial that a minute passed after Moriarty began beating Plaintiff, after which Sullivan tackled Vannaraj.  Pl. Ex. 13 at 17/18-24.

29.   Inthala Vannaraj stood up in response to this attack, but Lt. Sullivan tackled him as he reacted to Moriarty's beating of Khakeo.  Pl. Ex. 13 at 16/12-17/5; Pl. Ex. 14 at 13/1-18.

30.   Lt. Sullivan then hit Vannaraj repeatedly in the arm with his flashlight.  Pl. Ex. 13 at 17/2-5; Pl. Ex. 14 at 13/10-18 & 14/9-10.

31.   Vyrasack testified that Lt. Sullivan knocked chairs over in his effort to restrain the Plaintiff's guests, while Moriarty attacked the Plaintiff.  Pl. Ex. 11 at 17/12-18/4.

32.    Xaykham Kosaketh saw, when Moriarty first struck Phaysanh Khakeo, that Lt. Sullivan

was standing behind Vannaraj, and upon Vannaraj standing up, he was pushed down by

Lt. Sullivan.  Kosaketh then witnessed Lt. Sullivan strike Vannaraj with his flashlight.

Pl. Ex. 13 at 15/13, 16/12-14 & 18/15-16.

33.    Meanwhile, Moriarty beat Phaysanh Khakeo with his flashlight until he was bleeding

from his face and head (he was covered with blood), had bruised ribs, and was nearly

unconscious on the ground.  Pl. Ex. 6 at 85/21-23 & 120/21-23; Photograph of Phaysanh

Khakeo (hereinafter "Pl. Ex. 18").

34.    Moriarty and Lt. Sullivan assaulted Phaysanh Khakeo and Inthala Vannaraj in front of

Khakeo's guests, including his seven-year-old daughter, his mother, his wife, and his

nieces and nephews, approximately 8, 9, and 10.  Pl. Ex. 6 at 85/13-14; Pl. Ex. 7, ¶ 4.

35.    After Plaintiff and Vannaraj were on the ground, other officers arrived at the scene.

Plaintiff and Vannaraj, who had been beaten unconscious were arrested and charged with

disorderly conduct, resisting arrest, and assault and battery of a police officer.  Pl. Ex. 4;

Pl. Ex. 8.  Somphet Khakeo was arrested and charged with disorderly person.  Pl. Ex. 8.

36.    The officers never asked anyone else for their identities.  Pl. Ex. 2 at 93/5-16.

37.    Plaintiff regained consciousness after he was put in the police wagon.  Pl. Ex.16, 58/8-24.

38.    Before being booked, Phaysanh was separated from Somphet and Inthala.  Pl. Ex. 6 at

92/3-4.  He was told that he could not see his lawyer or family until after he was booked.

Pl. Ex. 6 at 92/14-93/7.

39.    In the garage, a couple of paramedics said they needed to clean Plaintiff and take a picture

before they took him to the hospital.  Pl. Ex. 6 at 93/14-23.  They wiped the blood away

and put a bandage over the cut before his mug shot was taken.  Pl. Ex. 6 at 98/10-12.

40.  After Plaintiff was booked, an officer took him to Saints Memorial Hospital.  He was still
     in the handcuffs placed on him at the time of his arrest.  Pl. Ex. 6 at 100/15-101/12.

41.  After waiting at the hospital for approximately an hour without treatment, Plaintiff asked
     to be taken back to the police station so that he could get bailed out by his family.  Pl. Ex.
     6 at 102/24-103/7.  He had already been Pl. Ex. 12, Nos. 7 and 11.

42.  The police took Plaintiff back to the station, where he was bailed out by his family.  Pl.
     Ex. 6 at 104/21 & 105/5-7.

43.  After being bailed out, Plaintiff returned to the hospital with his family.  He received
     seven stitches on his forehead.  Pl. Ex. 6 at 107/24-108/4; Pl. Ex. 12, No. 7.

44.  As a result of his physical injuries, Plaintiff had follow-up treatment at Harvard Vanguard
     Health Center.  Pl. Ex. 6 at 131/18-23; Pl. Ex. 12, No. 11.

45.  Plaintiff finally returned home at around three or four in the morning.  Pl. Ex. 12, No. 7.

46.  Phaysanh Khakeo and Inthala Vannaraj were each found not guilty of all charges at their
     trial in August 2002. *Com. v. Khakeo and Vannaraj*, Tr. Transcr. vol. III-1 (hereinafter
     "Pl. Ex. 17").  The charge against Somphet Khakeo was dismissed before trial.  Pl. Ex. 16
     at 69/6-23.

## II.    LEGAL ARGUMENT

## A.    Summary Judgment Standard

The Court should deny Defendant Sullivan's Motion for Summary Judgment.  Several
genuine issues of material fact remain vigorously disputed and require determination by a
factfinder, thereby preventing judgment as a matter of law.

8

> Summary judgment is inappropriate unless the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." No credibility assessment may be resolved in favor of the party seeking summary judgment.

*Woodman v. Haemonetics Corp.*, 51 F.3d 1087, 1091 (1st Cir. 1995) (quoting Fed. R. Civ. P. 56(c)) (other citations omitted). The parties in this case tell two entirely different stories – the police officers describe a wrestling match between Moriarty and Plaintiff and claim Vannaraj hit Moriarty, while all of the other witnesses deny that Plaintiff or Vannaraj ever struck anyone.

A motion for summary judgment is reviewed in the light most favorable to the party opposing summary judgment, and all reasonable inferences must be drawn on that party's behalf. *Fed. Refinance Co., Inc. v. Klock*, 352 F.3d 16, 30 (1st Cir. 2003). Defendant's version of the facts mistakenly resolves disputes in his favor. In order to "to survive summary judgment a plaintiff is not required to rely only on *uncontradicted* evidence." *Calero-Cerezo*, 255 F.3d at 19 (citing *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 9 n.3 (1st Cir. 1990)) (emphasis original). If "the plaintiff's evidence is both cognizable and sufficiently strong to support a verdict in [his] favor, the factfinder must be allowed to determine which version of the facts is most compelling." *Id.* Khakeo has produced sufficient evidence on the 1983 and MCRA claims against Defendant from which a jury could find in his favor; thus, his motion should be denied.

**B.**     **<u>Summary Judgment Should Be Denied Because Plaintiff Has Produced Sufficient Evidence To Establish Lieutenant Sullivan's Liability Under § 1983 and MCRA.</u>**

    **1.**     **Defendant Sullivan is Liable Under § 1983 for the Violation of Plaintiff's Fourth Amendment Rights**

Plaintiff's Section 1983 claims arise under the Fourth Amendment of the United States Constitution. Defendant incorrectly posits a lack of clarity within First Circuit jurisprudence as

to the constitutional source of Plaintiff's claim under section 1983, and wrongly contends the "shock the conscience" standard of the Fourteenth Amendment Due Process Clause applies here. *Torres-Rivera v. O'Neill-Cancel*, 406 F.3d 43, 50 (1st Cir. 2005).[2]  Law within the First Circuit is clear that, "[a] police officer who is actively engaged in a search or seizure, as here, is subject to the restrictions of the Fourth Amendment." *Id.* at 51.[3]  "The Supreme Court found no difference between an investigatory stop and an arrest or 'other 'seizure' of the person for purposes of the constitutional right to be free from the use of excessive force under the Fourth Amendment." *Id.* at 54 (citing and reiterating the core of *Graham v. Connor*, 490 U.S. 386, 395 (1989)).  In *Torres-Rivera*, the Court held that facts involving police brutality during an investigatory stop of a free citizen will generally give rise to "a straightforward Fourth Amendment excessive force claim." *Id.* at 51.

Under Fourth Amendment analysis, Khakeo must produce sufficient evidence that Lt. Sullivan's conduct vis-a-vis Moriarty's application of excessive force was not "objectively reasonable." *Id.* at 50-51.  "A 'shock the conscience' [analysis] would not be appropriate for [a] theory of joint participation." *Id.* at 52.[4]  Ordinary tort rules apply, and Khakeo has produced evidence demonstrating that Lt. Sullivan's conduct was objectively unreasonable.

---

[2] Whether or not a police officer on the scene has a realistic opportunity to intervene does not convert a Fourth Amendment claim into a Fourteenth Amendment claim. *Torres-Rivera*, 406 F.3d at 52.

[3] Defendant attempts to confuse the issue by referring to law applicable to a supervisory officer who was <u>not</u> present on the scene. In *Torres-Rivera*, the Court explained that "a police supervisor who is not on the scene and does not engage in the search or seizure but is later alleged to have violated a duty to have trained the officers" would be liable under the Fourteenth Amendment standard. *Id.* at 51.

[4] Defendant's reliance on footnote 29 in *Wilson v. Town of Mendon*, 294 F.3d 1, 14 (1st Cir. 2002) is misplaced. This footnote did not change the settled law in this circuit. This is shown in *Torres-Rivera*, decided three years after *Wilson*. 406 F.3d at 52 (The factual question of whether an officer had a realistic opportunity to intervene "would not convert [the case] from a Fourth Amendment claim to a Fourteenth Amendment claim.")

2.    **Evidence Shows That Lieutenant Sullivan Is Liable Under § 1983 For His Joint Action With Officer Moriarty, His Failure to Intervene, and In His Capacity as a Supervisor.**

In his capacity as a fellow police officer, who is present at the scene when another officer commits a Fourth Amendment violation, Lt. Sullivan may incur liability on three bases. *See Torres-Rivera*, 406 F.3d at 51-52; *Seekamp v. Michaud*, 109 F.3d 802, 808 (1st Cir. 1997). First, liability attaches under joint tortfeasor principles when "the onlooker officer is instrumental in assisting the actual attacker or aggressor to place the victim in a vulnerable position." *Torres-Rivera*, 406 F.3d at 52. Second, even if an officer does not enhance the aggressor's opportunity to violate the victim's constitutional rights, he has an affirmative duty to intervene and protect the victim. *See Id.* at 51-52. "An officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held liable under section 1983 for his nonfeasance." *Gaudreault v. Mun. of Salem*, 923 F.2d 203, 207 n.3 (1st Cir. 1990)(citations omitted). As Moriarty's supervisor, Lt. Sullivan may also incur liability under a third theory for his subordinate's constitutional violations when Lt. Sullivan's "action or inaction [is] 'affirmatively linked' to that behavior in that it could be characterized as 'supervisory encouragement, condonation or acquiescence' or 'gross negligence amounting to deliberate indifference.'" *Seekamp*, 109 F.3d at 808.

Record evidence and inferences reasonably drawn therefrom demonstrate that Lt. Sullivan is liable under all three theories: he acted in concert with Moriarty to violate the Plaintiff's constitutional rights, he was able to intervene but chose not to protect Plaintiff from Moriarty's attack, and he condoned, encouraged, and acquiesced in Moriarty's actions as his supervisor.

11

a.    **Lt. Sullivan Was Instrumental in Depriving Plaintiff's Constitutional Rights by His Joint Action With Moriarty**

Lt. Sullivan acted jointly with Moriarty to deprive Phaysanh Khakeo of his civil rights.  A joint venture may launch spontaneously: "there is no requirement that a plaintiff seeking to establish joint venture liability prove the existence of an anticipatory compact...." *Wilson v. Town of Mendon*, 294 F.3d 1, 15 (1st Cir. 2002).  Lt. Sullivan actively and jointly engaged with Moriarty in initiating and carrying out an investigatory stop.  They both got out of the police car with a plan, *i.e.*, to perform a *Terry* stop, and they both exercised police authority against the individuals at Plaintiff's home.  For example, Lt. Sullivan ordered some of the men, including Phaysanh, against a wall.  This places the case at bar squarely within the realm of the Fourth Amendment and on all fours with the facts in *Torres-Rivera*.  Lt. Sullivan was present and nearby before, during, and after Moriarty's use of excessive force against Phaysanh Khakeo.  "In such a scenario, the onlooker officer[] and the aggressor officer are essentially joint tortfeasors and, therefore, may incur shared constitutional responsibility." *Martinez v. Colon*, 54 F.3d 980, 985 n.4 (1st Cir. 1995). Rather than promptly checking I.D.s or investigating their alleged hunch of gang involvement,[5] Lt. Sullivan and Moriarty intimidated and coerced Plaintiff and his guests, created a tense and violent atmosphere, and assaulted Plaintiff and Vannaraj.

By issuing commands to Phaysanh and others present, and by actively using force against Vannaraj, Lt. Sullivan was "instrumental in assisting" Moriarty put Phaysanh "in a vulnerable

---

[5] Lt. Sullivan admitted that he failed to get any names or addresses of those present; he did not ask whether anyone had been involved in a fight; he did not investigate to see whether anyone had just been running, *e.g.*, by checking their heart rate; and he did not try to identify the property owner or investigate what kind of a party was going on there.  Lt. Sullivan and Moriarty testified they were familiar with Asian gang members in the Lowell area, and they did not recognize anyone at the barbeque to be a gang member.

12

position" in order to use excessive force against him. *Torres-Rivera*, 406 F.3d at 52 (internal

quotation marks omitted).  While Moriarty aggressively challenged Plaintiff's right to ask his

name, Lt. Sullivan tried to keep the Plaintiff's family and friends away.  This situation is similar

to *Torres-Rivera*, where the defendant assisted in ordering the victim against the wall, and used

his authority as a police officer to keep the victim's family members away from the victim.  406

F.3d at 45-46.  Lt. Sullivan knocked chairs over in his effort to restrain the Plaintiff's guests,

even as Moriarty attacked the Plaintiff nearby.  Lt. Sullivan used excessive force on Vannaraj as

Moriarty attacked Phaysanh Khakeo, tackling Vannaraj from behind and striking him several

times in the arm with a flashlight.

Lt. Sullivan joined Moriarty in violating the Plaintiff's Fourth Amendment rights not only

by commanding Khakeo against the wall, but also by using his police authority to preserve a

perimeter in which Moriarty could freely use excessive force and by using excessive force

himself against another one of Plaintiff's guests.

### b.    Lt. Sullivan Violated His Affirmative Duty to Protect Plaintiff by Failing to Intervene Through His Non-Action

Lt. Sullivan breached his duty to intervene when he observed Moriarty violating the

Plaintiff's constitutional rights and failed to call out, or in any way stop Moriarty.  An officer has

an affirmative duty to intervene and protect the victim of another officer's use of excessive force.

*See Torres-Rivera*, 406 F.3d at 51-52.  "An officer who is present at the scene and who fails to

take reasonable steps to protect the victim of another officer's use of excessive force can be held

liable under section 1983 for his nonfeasance." *Gaudreault*, 923 F.2d at 207 n.3.  This

affirmative duty includes calling out to officers who use excessive force. *Davis v. Rennie*, 264

13

F.3d 86, 114 (1st Cir. 2001)(holding that the onlooker officer had a duty to call out to prevent the use of excessive force).  Whether or not the circumstances and duration of the incident afforded Lt. Sullivan an opportunity to intervene is a question of fact properly left to the jury.  *See Torres-Rivera*, 406 F.3d at 53.

During Moriarty's one-sided altercation with the Plaintiff, Lt. Sullivan did not issue any voice command, or verbally question Moriarty as Moriarty beat Phaysanh.  Even if there was not time physically to prevent Phaysanh's beating, had Lt. Sullivan ordered to Moriarty to "stop," it is reasonable to infer that his authority as Moriarty's supervisor would have been sufficient to terminate Moriarty's attack.  *See Davis*, 264 F.3d at 114 (recognizing that "as [the co-defendant's] supervisor, [the defendant] had the responsibility to [call out], and it is reasonable to expect her to have known that.")[6]; *see also Torres-Rivera*, 406 F.3d at 53 ("it was for the jury to resolve [the] question of fact, [and] decide whether or when [the defendant] could have realistically intervened during the episode".)  Lt. Sullivan admitted that he observed Moriarty and Plaintiff "verbally engaged," which must refer to Moriarty swearing at Khakeo and Khakeo saying his name.  He should have commanded Moriarty to de-escalate the situation at this point.

Lt. Sullivan did not take any steps to protect the Plaintiff, although he was 10 feet away.  It is reasonable to infer from record evidence that there was sufficient time for Lt. Sullivan to intervene, since he admitted he heard the interaction and he had time to tackle and hit Inthala Vannaraj with his own flashlight during Moriarty's attack of Phaysanh Khakeo.  In *Torres-*

---

[6]  As Moriarty's supervisor, there is no question that Lt. Sullivan's duty to intervene went beyond physical intervention, as recognized by the *Davis* case, since "[i]n the case of supervisory officers, the duty to intervene and to exercise appropriate command functions is greater."  *Herrera v. Davila*, 272 F.Supp.2d 154, 162 (D.P.R. 2003)(quoting from Michael Avery, David Rudovsky and Karen M. Blum, Police Misconduct Law and Litigation § 4.8 p. 4-14 (footnote omitted) (Thompson-West 3rd ed.1996)).

*Rivera*, 406 F.3d at 46, the defendant officer "stood where he was and did not intervene" during the beating of the victim. Lt. Sullivan also had an affirmative duty to physically travel the short distance of 10 feet to prevent further beating, and whether there was ample time to do so is a disputed question of fact. *See Torres-Rivera*, 406 F.3d at 52 (onlooker officer, 10 feet from officer committing excessive force, had affirmative duty to intervene).

In this case, both officers arrived on the scene and detained several men; Lt. Sullivan said it was a *Terry* stop. In *Torres-Rivera*, two officers were engaged in an investigatory stop, when both officers engaged in aggressive and assaultive behavior with no provocation. *Id.* at 51. The bystander police officer had restrained an innocent boy against the wall and then stood 10 feet away and failed to intervene as another officer beat the boy. *Torres-Rivera*, 406 F.3d at 45-46 and 52. Lt. Sullivan was 10 feet away when Moriarty yelled to Plaintiff, "What's your fucking name," thereby creating a tense atmosphere. When Plaintiff responded by yelling his name; all present heard this. Before Moriarty responded by attacking Plaintiff, or, at a minimum, at the point where Moriarty first swore at Plaintiff, Lt. Sullivan should have issued an order to Moriarty and taken control of the situation.[7] Lt. Sullivan had approximately a minute to react before he took any action, at which point he tackled Vannaraj. In *Torres-Rivera*, the court recognized,

> [t]here was conflicting testimony as to how long the entire assault lasted and it was for the jury to resolve that question of fact, decide whether and when [the bystander officer] could have realistically intervened during the episode, and determine how much of the damages [the victim] suffered should be attributed to [the bystander officer].

---

[7]Defendant makes much of the fact that Lt. Sullivan was ten to fifteen feet from the incident. The defendant in *Torres-Rivera* was ten feet away from the officer beating the victim, and the Court upheld a jury finding that it was not reasonable that he failed to intervene. 406 F.3d at 45. It is reasonable to infer that Lt. Sullivan could have covered such a distance. Even if he could not physically have prevented the beating, he easily could have called out and been heard from that range.

406 F.3d at 53.[8]  In this case, there is conflicting testimony, not only about the time that transpired, but also the extent of physical contact between Moriarty and Plaintiff.  The police officers say that a "wrestling match" occurred, which none of the other witnesses saw; Plaintiff denies this.  Rather than intervening, Lt. Sullivan decided to remain between Moriarty and others present, and when Inthala Vannaraj stood up as the beating commenced, Lt. Sullivan beat Vannaraj, allowing Moriarty's beating of Phaysanh to continue unfettered.  A jury find that Vannaraj did not touch Lt. Sullivan, and they could infer that Lt. Sullivan had time to intervene.

Lt. Sullivan failed to intervene on Phaysanh Khakeo's behalf despite evidence demonstrating that he had the time and opportunity to do so.  Lt. Sullivan observed the situation escalate as Moriarty first swore at Plaintiff and subsequently beat him with a flashlight.  Lt. Sullivan's non-action – his failure to take reasonable steps to protect Plaintiff – caused the deprivation of Plaintiff's constitutional rights, and therefore he is liable to Plaintiff.

### c.    Lt. Sullivan Failed to Supervise Moriarty Appropriately

Lt. Sullivan, as a supervising officer is liable for his subordinate's constitutional violations when his "action or inaction [is] 'affirmatively linked' to that behavior in that it could be characterized as 'supervisory encouragement, condonation or acquiescence' or 'gross negligence amounting to deliberate indifference.'" *Seekamp,* 109 F.3d at 808.  Supervisor liability arises "even if a supervisor lacks actual knowledge of censurable conduct" or "if the supervisor did not participate directly in the conduct that violated a citizen's rights."

---

[8]Defendant argues that "the circumstances existing at the moment at which the Plaintiff claims that Lt. Sullivan should have intervened were anxious, foreboding and did not admit of sufficient occasion for measured action."  At summary judgment, however, the facts are viewed in the light most favorable to the party opposing summary judgment, *See Fed. Refinance Co., Inc. v. Klock*, 352 F.3d 16, 30 (1st Cir. 2003), and a jury could conclude from Plaintiff's evidence that Lt. Sullivan had time to intervene.

*Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576, 582 (1st Cir. 1994).  Alternatively, the plaintiff may show deliberate indifference, which entails, "(1) a grave risk of harm; (2) the [supervisor's] actual or constructive knowledge of that risk; and (3) his [or her] failure to take easily available measures to address the risk."  *McIntyre v. US*, 336 F.Supp.2d 87, 127 (D.Mass. 2001)(citations ommitted).  Supervisory liability "can arise out of participation in a custom that leads to a violation of constitutional rights, or by acting with deliberate indifference to the constitutional rights of others."  *Herrera v. Davila*, 272 F.Supp.2d 154, 162 (D.P.R. 2003) (citing *Diaz v. Martinez*, 112 F.3d 1, 4 (1st Cir. 1997)).

As Moriarty's supervisor, Lt. Sullivan was responsible for his actions because he failed to supervise him appropriately.  Lt. Sullivan's actions and non-action served to encourage, condone and acquiesce in Moriarty's excessive force.  Lt. Sullivan deliberately chose not to intervene in Moriarty's actions, even by as much as a voice command when Moriarty swore at the Plaintiff, whom defendants both admit was assisting them in keeping people calm up to that point.  Moriarty's actions violated police rules and regulations and increased the tension at the scene.  Lt. Sullivan admitted that he observed Moriarty and Plaintiff "verbally engaged," which must refer to Moriarty swearing at Khakeo and Khakeo saying his name.  When Moriarty swore at Plaintiff, it should have alerted Lt. Sullivan to the fact that Moriarty was out of control.  As Moriarty's supervisor, it is particularly egregious that he permitted Moriarty to swear at the person he admits was calm.  By using excessive force against Vannaraj, Lt. Sullivan "affirmatively linked" his actions to Moriarty's, and in this way actively condoned Moriarty's violent actions against Phaysanh.

In the alternative, Lt. Sullivan's actions during the incident amounted to deliberate indifference. Moriarty's use of excessive force against Phaysanh Khakeo presented a grave risk of physical harm as well as the violation of his civil rights guaranteed under the Fourth Amendment. *See Maldonado-Denis*, 23 F.3d at 583 (accepting that a violation of plaintiff's civil rights is a grave harm, but affirming summary judgment for lack of causal connection). Lt. Sullivan was aware of that risk. He realized that no gang members were present; he did not conduct a proper *Terry* stop, ask for anyone's identity, or check pulses to see if anyone ran from the fight. Yet he remained there and permitted Moriarty to use inflammatory language. Lt. Sullivan could easily have called out to Moriarty or physically intervened on Phaysanh's behalf. "The clearest cases of supervisory liability are where the supervisors are present at the scene of police activity and fail to prevent unconstitutional acts by their subordinates." *Herrera*, 272 F.Supp.2d at 162 (quoting Michael Avery, David Rudovsky and Karen M. Blum, Police Misconduct Law and Litigation § 4.8 p. 4-14 (footnote omitted) (Thompson-West 3rd ed.1996)). Being present on the scene as Moriarty's supervisor, and having failed to take any action to prevent Moriarty's deprivation of Plaintiff's constitutional rights, Lt. Sullivan is liable. *See Id.*

**3.     Lt. Sullivan Is Not Entitled To Qualified Immunity**

Qualified Immunity does not shield Lt. Sullivan from suit. First, in evaluating qualified immunity the Court must determine, by looking at the facts in the light most favorable to the injured party, whether Lt. Sullivan's conduct violated a constitutional right. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Torres-Rivera*, 406 F.3d at 54. Next, the constitutional right at issue must have been clearly established at the time of the violation sufficiently to put an officer on notice. *See Saucier*, 533 U.S. at 201; *Torres-Rivera*, 406 F.3d at 54. Finally, the Court must

analyze whether a reasonable officer in Lt. Sullivan's situation would realize that his conduct violated the right at issue. *See Torres-Rivera*, 406 F.3d at 54. The facts need not be materially similar to prior precedent, so long as it would be apparent that the conduct was unlawful. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). In arguing for qualified immunity, Defendant ignores disputes of material fact, portraying them in the light most favorable to his version,[9] draws inferences in his favor,[10] and misstates the law.[11]

In this case, Plaintiff's right to be free from excessive force, derived from the Fourth Amendment right to be free from unreasonable search and seizure, was violated. *See Graham*, 490 U.S. 386 (1989) (holding that the Fourth Amendment prohibits excessive force during investigatory detentions), *Martinez*, 54 F.3d 980 (1st Cir. 1995) (acknowledging the same), *Gaudreault*, 923 F.2d 203 (1st Cir. 1990) (same). The obligation not to strike a person with a flashlight when the person posed no physical threat was well established by 1989. *Graham*, 490 U.S. 386 (1989).

Lt. Sullivan's affirmative duty to intervene on behalf of the Plaintiff to protect this right was clearly established at least by the mid-1990's. *See, e.g., Graham*, 490 U.S. 386 (1989),

---

[9] For example, Defendant states, unequivocally, that he was assaulted by Vannaraj. Vannaraj vehemently denies this, and he was found not guilty of assault and battery upon Sullivan at trial. Defendant also misapplies the law on this point – he is wrong to contend that the right has not been delineated as to when an officer is himself the victim of a battery, since viewing the facts in the light most favorable to the Plaintiff, *see Saucier*, 533 U.S. at 201, Lt. Sullivan was not the victim of a battery.

[10] For example, Defendant claims that he and Moriarty were outnumbered and fearful for their safety in a dangerous situation. But everyone present cooperated with all of their demands and the officers were not injured. The officers were the only aggressors at the scene, leading to the reasonable inference that Lt. Sullivan and Moriarty had no reason to be fearful, and, in fact, had no fear for their safety. Moreover, there is no evidence that they made calls for backup that went unheeded. In fact, only 2 or 3 arrests were made at the scene of the fight. Pl. Ex. 3, 49/4.

[11] For example, Defendant is wrong to contend that the right was not clearly established with regard to non-physical intervention.

*Martinez*, 54 F.3d 980 (1st Cir. 1995), *Gaudreault*, 923 F.2d 203 (1st Cir. 1990).  A reasonable

officer, in Lt. Sullivan's circumstances, would realize that failing to intervene, failing to

supervise Moriarty, as well as acting to facilitate the use of excessive force against Plaintiff

clearly violated his rights.  *See Anderson v. Branen*, 17 F.3d 552 (2d Cir. 1994) (supervisor of

two DEA agents held liable under section 1983 for failing to intervene after fellow agents

attacked plaintiffs without provocation, and for restraining one of the victims, preventing him

from helping the other); *see also Torres-Rivera*, 406 F.3d at 54-55 (recognizing clear duty to

intervene existed in 1998, when officer ten feet away witnessed another officer using excessive

force during investigatory detention).

      **a.**      **Phaysanh Khakeo's Constitutional Rights Were Violated**

      Phaysanh Khakeo's constitutional rights, protected by the Fourth Amendment, were

violated when excessive force was used against him.  *See Graham*, 490 U.S. 386 (1989)(holding

that the use of excessive force during investigatory stops implicates the protections of the Fourth

Amendment), *Torres-Rivera*, 406 F.3d at 48 (affirming a jury finding that defendant's use of

excessive force violated plaintiff's Fourth Amendment Rights), *Gaudreault*, 923 F.2d at 205 ("A

claim that the police used excessive force in making an arrest must be analyzed in light of the

Fourth Amendment's prohibition of unreasonable searches and seizures.") The unprovoked attack

by someone cloaked with police authority against an innocent civilian is a "straightforward

Fourth Amendment excessive force claim." *Torres-Rivera*, 406 F.3d at 51; *see also, Anderson*,

17 F.3d at 555-556.  It is undisputed that Phaysanh was injured, and that Moriarty and Sullivan

were exercising their police authority in the investigatory stop.  Viewing the facts in the light

most favorable to Plaintiff, Lt. Sullivan's joint actions in facilitating the excessive force and

failing to prevent it or appropriately supervise Moriarty violated Phaysanh's constitutional rights.

**b.    Sullivan's Liability for the Excessive Force was Clearly Established and Sufficiently Delineated**

At the time of Lt. Sullivan's actions in 2001, it was well established and sufficiently clear that an officer has a duty to intervene when another officer is using excessive force against a citizen in the context of an investigatory detention. *See Torres-Rivera*, 406 F.3d at 54 (holding that it is "simply wrong" to assert that the affirmative duty for an officer to intervene against another officer using excessive force during an investigatory detention was not clearly established by 1998); *see also, Anderson*, 17 F.3d at 557 ("It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." (citations omitted.)); *Davis*, 264 F.3d at 113-14 (same); *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2nd Cir. 1988) (same); *Gaudreault*, 923 F.2d at 207, n.3 (same). The Supreme Court and First Circuit have even explored the issue specifically as it relates to investigatory detentions. *Graham*, 490 U.S. at 395; *Martinez*, 54 F.3d 980; *Torres-Rivera*, 406 F.3d at 54-55.

Defendant is just plain wrong that the law was not clearly established regarding a duty to prevent excessive force by any means other than physical intervention. Defendant relies on the fact that *Davis* was decided only four days prior to this incident. (Def. Sullivan's Motion for Summary Judgment at 19.) However, the *Davis* court held that there was <u>never</u> any restriction of the duty to intervene that such intervention had to be physical, particularly with regard to supervisors on the scene, and, in rejecting qualified immunity, recognized that such a duty was already clearly established at the time of the incident, in 1993. *Davis*, 264 F.3d at 104; *see also,*

21

*Herrera*, 272 F.Supp.2d at 152 (recognizing that the duty to intervene "and exercise appropriate command functions" is greater for supervisors on the scene); *Hope*, 536 U.S. at 741 (holding that "officials can still be on notice that their conduct violates established law even in novel factual circumstances"). Quoting *Durham v. Nu'Man*, 97 F.3d 862 (6th Cir. 1996), the *Davis* court recognized that "[c]oming to [the victim's] aid would not have required [the supervisor] to become physically involved in the incident." 264 F.3d at 104.[12] The Defendant is attempting to split hairs, which the First Circuit rightly rejected in the *Davis* case, and which this Court should reject in this case. Lt. Sullivan was on notice that he had an affirmative duty to intervene as a fellow officer and a duty to exercise command functions as a supervisor, which is more than to say his only duty was to intervene <u>physically</u>.[13] *See Anderson v. Creighton*, 483 US 635, 640 (1987) (holding that "the very action in question" need not have previously been deemed unlawful); *cf. Herrera*, 272 F.Supp.2d at 162 (quoting Michael Avery, David Rudovsky and Karen M. Blum, Police Misconduct Law and Litigation § 4.8 p. 4-14 for proposition that supervisors must exercise appropriate command functions.)

### c.    A Reasonable Officer in Lt. Sullivan's Situation Would Have Known His Conduct Violated Phaysanh Khakeo's Rights

Defendant's suggestion that Lt. Sullivan might not know that he could be liable for letting a subordinate officer commit excessive force is outrageous. Given the clearly established right of

---

[12] For the purposes of liability under the MCRA, the Massachusetts Supreme Judicial Court held, in 1993, that bystander officers, who were not even the assaulting officers' supervisor, were liable after they "made no attempt <u>by word</u> or deed to protect [plaintiff.]" *Com. v. Adams*, 624 N.E.2d 102, 104 (Mass. 1993) (emphasis added).

[13] Even holding Lt. Sullivan's duty to intervene vocally aside, he was most certainly on notice of his duty to intervene physically and whether or when there was a realistic opportunity to do so is a question of disputed fact. *See Graham*, 490 U.S. at 395, *Torres-Rivera*, 406 F.3d at 55, *Davis*, 264 F.3d at 98, *Gaudreault*, 923 F.2d 207.

Plaintiff to be free from excessive force during an investigatory detention, any reasonable officer would know acting to further the unlawful conduct violates the victim's rights. A reasonable officer would also know taking no action while a fellow officer beats a civilian to the point of unconsciousness without any provocation violates the affirmative duty to intervene. *See Torres-Rivera*, 406 F.3d at 54-55 (declining to overturn a lower court's denial of qualified immunity), *Anderson*, 17 F.3d at 558 (overturning judgment exonerating supervisory officer who failed to intervene while two subordinates beat two innocent victims during investigatory detention). Finally, Lt. Sullivan's role as supervisor more obligated him to take action, particularly to command Moriarty to stop, especially where Plaintiff was acting to assist the officers in keeping the situation calm. *See Davis*, 264 F.3d at 114; Michael Avery, David Rudovsky and Karen M. Blum, Police Misconduct Law and Litigation § 4.8 p. 4-14 (Thompson-West 3rd ed.1996).

### 4.    Lt. Sullivan is Liable Under M.G.L. ch. 12 § 11I ("The MCRA")

Record evidence demonstrates that Defendant used "threats, intimidation, or coercion" to interfere, or attempt to interfere, with Plaintiff's state and federal rights, in violation of the MCRA. M.G.L. ch. 12 § 11I; *Brum v. Town of Dartmouth*, 704 N.E.2d 1147 (Mass. 1999). The Massachusetts Supreme Court has defined "threats, intimidation, or coercion" as follows:

> "Threat" in this context involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm.... "Intimidation" involves putting in fear for the purpose of compelling or deterring conduct.... [C]oercion ... [is] "the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done.

*Planned Parenthood League of Mass., Inc. v. Blake*, 631 N.E.2d 985, 990 (Mass. 1994)(quoting Webster's New Int'l Dictionary at 519 (2d ed.1959)). Failing to intervene to protect a victim from the excessive force of other officers is a violation of the MCRA. *Com. v. Adams*, 624 N.E.2d

23

102, 106 (Mass. 1993)("The failure of the non-battering defendants to intervene to protect [plaintiff]'s rights" violates the MCRA.)

The Supreme Judicial Court, in *Adams*, held that officers who were "aware of the threatening and intimidating physical acts," *i.e.* the beating of the plaintiff, and did nothing to intervene, were liable under the MCRA.  *Id.*  Similarly, Lt. Sullivan was aware of Moriarty's beating of Plaintiff, and therefore is liable for those "threatening and intimidating" acts under the MCRA.  Moreover, Lt. Sullivan engaged in coercive action to interfere with Plaintiff's constitutional right to be free of excessive force when he ordered Plaintiff against the wall.  In *Davis*, the First Circuit found that medical staff who held down a victim in order to facilitate the use of excessive force against him, rather than intervening to help him, had acquiesced in the co-defendant's use of excessive force and were thus liable under the MCRA.  264 F.3d at 112.  When Lt. Sullivan ordered men, including Plaintiff, up against the wall, he created and contributed to a coercive environment and caused Plaintiff to do something against his will.  This proved damning, as Plaintiff was backed against the wall when Moriarty attacked him – he had no where to go, he was trapped.  Lt. Sullivan also chose to tackle and batter Vannaraj and to keep Plaintiff's guests at bay, rather than intervene to help Plaintiff.  Lt. Sullivan's restraint of Vannaraj is properly characterized as "coercion" within the meaning of the MCRA in that it manifested an "acquiescence" to Moriarty's intent to violate the Plaintiff's civil rights**.**  *See Davis*, 264 F.3d at 112.

## IV.    <u>CONCLUSION</u>

The Court should deny Defendant Lt. Sullivan's Motion for Summary Judgment. Plaintiff has produced sufficient evidence from which a jury could conclude that Defendant Lt.

Sullivan is liable to Plaintiff Khakeo under section 1983, the MCRA.  Because several material,

factual issues remain in dispute, Plaintiff's claims against Defendant Lt. Sullivan are not

amenable to resolution as a matter of law; thus, the motion for summary judgment should be

denied.

RESPECTFULLY SUBMITTED,
For the plaintiff:

/s/ Howard Friedman

_____

Howard Friedman, BBO# 180080
Jennifer L. Bills, BBO# 652223
Law Offices of Howard Friedman, P.C.
90 Canal Street, 5th Floor
Boston, MA 02114-2022
(617) 742-4100

Dated:    January 20, 2006

**CERTIFICATE OF SERVICE**

I certify that on this day a true copy of the above
document was served upon the attorney of record
for each party by mail / by hand.

Date: January 20, 2006   Howard Friedman