Exhibit 3

```
                                    Volume:   I
                                     Pages:   1-84
                                   Exhibits:  1-12
```

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO.: 04-11041-RWZ

PHAYSANH KHAKEO,                    )
            Plaintiff,              )
                                    )
    vs.                             )
                                    )
DENNIS MORIARTY,                    )
in his individual capacity,         )
KEVIN SULLIVAN,                     )
in his individual capacity,         )
and the CITY OF LOWELL,             )
            Defendants.             )
                                    )

DEPOSITION of KEVIN SULLIVAN, a witness called on behalf of the Defendant, taken pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Barbara A. Keedwell, a Certified Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Law Offices of Howard Friedman, P.C., 90 Canal Street, Boston, Massachusetts, on Friday, May 13, 2005, commencing at 10:00 a.m.

JANEY ASSOCIATES
P.O. Box 375355
Boston, MA 02136-0003
(617) 364-5555
Fax (617) 364-5550

1    APPEARANCES:

2         LAW OFFICES OF HOWARD FRIEDMAN, P.C.
              [BY:  Jennifer L. Bills, Esquire
3              -and- Howard Friedman, Esquire]
               90 Canal Street
4              Boston, Massachusetts 02114-2002
               for the Plaintiff.

5

6

         CITY OF LOWELL LAW DEPARTMENT
7              [BY:  Brian W. Leahey, Esquire]
               375 Merrimack Street, Room 51
8              Lowell, Massachusetts 01852
               for the Defendant City of Lowell.

9

10        REARDON, JOYCE & AKERSON, P.C.
              [BY:  Andrew J. Gambaccini, Esquire]
11             397 Grove Street
               Worcester, Massachusetts 01605
12             for the Defendant Kevin P. Sullivan.

13

14    Also Present:  Alejandra Hung

15

16

17

18

19

20

21

22

23

24

1
I N D E X

2  Testimony of:                                    Page

3  KEVIN SULLIVAN

4   Examination by Ms. Bills                          4

5

6

7
E X H I B I T S

8

Exhibit No.            Description                 Page

    1        General Order 01-04                  13

    2        General Order 87-01                  14

    3        Answers to Interrogatories           17

    4        Arrest Report, 9/9/01                18

    5        To From Letter - 9/19/01             21
             Superintendent Edward Davis
             -Lieutenant Paul Laferriere

    6        Arrest Report, 9/9/01,               49
             Defendant Pheaktra Im

    7        Arrest Report, 9/9/01,               50
             Defendant Mark Walker

    8        Booking Sheet                        71

    9        Arrest Report, 9/9/01                73

   10        CAD Operations Report                75

   11        To From Letter - Lowell Police       77
             Department-Crime Analysis Unit

   12        Diagram                              79

1      Q.   Well, what is your answer referring to, what

2   time frame?

3      A.   When I was assigned to this unit, I was

4   assigned to the Community Response Unit who is partly

5   responsible -- one of our responsibilities was to

6   enforce gang-related activities in the City of

7   Lowell.  Prior -- prior to being assigned -- this

8   unit was devised at the time I went in.  Back in the

9   mid-'90s there was -- there were two detectives

10  and -- actually I believe there were four detectives

11  assigned to the criminal bureau that were referred to

12  as a gang unit.  That was back, I would say, '94

13  through '98.  And then --

14     Q.   So in 2001 it's your testimony there was

15  nothing in the Lowell department that was referred to

16  as a gang unit?

17     A.   Well, I was assigned to the Community

18  Response Unit and individuals may have referred to us

19  as a gang unit, but our official title was Community

20  Response Unit.

21     Q.   Okay.

22          MS. BILLS:  I'd like to have another

23  document marked.

24        (Exhibit No. 4 marked for identification)

1      Q.    I show you what's been marked Exhibit No. 4

2  for identification.    Do you recognize this document?

3      A.    Yes.

4      Q.    What is it?

5      A.    This is a photocopy of an arrest report that

6  was written by Officer Dennis Moriarty.

7      Q.    Will you just read the first sentence to

8  yourself?

9      A.    Yes.

10              (Witness reads)

11      A.    Okay.

12      Q.    And this is Officer Moriarty's police report

13  from the night of September 9, 2001?

14      A.    Yes, it is.

15      Q.    And he says in it that you and he were

16  assigned to the gang unit; is that right?

17      A.    That's what he wrote.

18      Q.    Okay.    It's your testimony today that --

19  strike that.

20              Does the Lowell Police Department have

21  more than one Community Response Unit or gang unit.

22      A.    There's -- at this time there's one

23  Community Response Unit.

24      Q.    Okay.

1      A.    And at this time I believe there are four

2   patrol officers and one supervisor assigned to it.

3   On occasion and depending on the climate in the city

4   there are often one or two detectives that may work

5   along with this unit.

6            MR. LEAHERY:  When you say "this time,"

7   just to clarify, is this time 2001 or this time

8   today?

9      A.    No, this time right now, as we sit in this

10  room.

11           MS. BILLS:  Thank you for that

12  clarification.

13     Q.    As of 2001 was -- the same question.  Was

14  there one unit or several officers?

15     A.    There was just one Community Response Unit

16  that I was assigned to with four other officers.

17     Q.    If there was a call for a gang fight or some

18  gang-related problem, would the gang unit be

19  dispatched to that event?

20     A.    Our community response would be.  We would

21  be dispatched -- the initial dispatched call always

22  went out to the area cruiser that was assigned to

23  that area.

24     Q.    Okay.

1          A.    And our response would be after the
2     dispatched call.  We would provide support to the
3     patrol services was our major function.
4          Q.    Can you explain what you mean by "support"?
5          A.    In a Community Response Unit our activities
6     were not solely focused on gang-related issues.  We
7     supported the patrol force in every major call of
8     where we could provide assistance.  Whether it was a
9     medical call such as a choking baby, we -- on most
10    nights, on most evenings we would have two separate
11    units in the city with one or two officers in each
12    car.  So our -- the Community Response Unit was to --
13    was formed to respond to incidents across the city
14    where we could provide assistance to the patrol
15    force.
16         Q.    I show you another exhibit.
17              MS. BILLS:  Have this marked for
18    identification.
19         (Exhibit No. 5 marked for identification)
20         Q.    I show you what's been marked Exhibit 5 for
21    identification.  Can you identify this document?
22         A.    This is a copy of a To From letter to the
23    Superintendent Edward Davis from Lieutenant Paul
24    Laferriere, dated September 19 of 2001, and the

1  subject is Citizen complaints.

2       Q.   And will you read to yourself No. 2?

3            (Witness reads)

4       A.   Yes.

5       Q.   That states certain cars responded to a call

6  including a unit called the gang unit.  Would that be

7  referring to your car with you and Moriarty?

8       A.   That refers to -- what he's terming "gang

9  unit" would be Community Response, yes.

10      Q.   Are you familiar with the City of Lowell?

11      A.   Yes.

12      Q.   Have you lived there for a long time?

13      A.   I haven't lived there.  I've worked there

14  since 1992.

15      Q.   Okay.  So you spend working hours in the

16  City of Lowell?

17      A.   Yes, I do.

18      Q.   Let me draw your attention to the incident

19  of September 9, 2001.  Do you recall what you did

20  that day before your shift started or what time your

21  shift started?

22      A.   My shift started at 4 p.m.  I worked from 4

23  p.m. till 12 midnight, that was my assigned shift on

24  that day.

1  Q. Do you recall anything before your shift on

2 that day?

3  A. No, I don't.

4  Q. What was your job assignment that day?

5  A. My assignment that day was the officer in

6 charge of the Community Response Unit.

7  Q. Okay.  And were you assigned to work with

8 Officer Moriarty?

9  A. Yes.

10  Q. And you were in uniform?

11  A. Yes, I was.

12  Q. Was Officer Moriarty in uniform?

13  A. No, he was not.

14  Q. Why not?

15  A. I had him come in to work wearing plain

16 street clothes.

17  Q. And why did you do that?

18  A. Oftentimes I would make a decision of

19 placing one of our officers in plain clothes in an

20 unmarked car throughout different problem areas in

21 the city to observe activity and in doing so that

22 officer -- and in this case Officer Moriarty that

23 night was wearing plain clothes -- would often radio

24 back to us of different trouble locations and what

1    was going on in certain streets and certain areas.

2         Q.    And how is it then he was in your marked car

3    and not an unmarked car?

4         A.    At that time -- I can't say for sure at this

5    particular time why he was in my patrol car.

6    Oftentimes we had -- the availability of an unmarked

7    car was often breaking down with mechanical problems

8    and that -- a majority of the time that played a

9    role.

10        Q.    Okay.  But you don't recall specifically

11   why?

12        A.    No.

13        Q.    There was a call -- you received a call that

14   day for a gang fight.  Do you recall that?

15        A.    There was a dispatched call given out, yes.

16        Q.    And were you dispatched directly?

17        A.    No.

18        Q.    Okay.  Where were you at the time?

19        A.    At the time the dispatched call was given

20   out, we were at the intersection of Chelmsford and

21   Westford Street.

22        Q.    Okay.  I'm going to give you a sheet of

23   paper and ask you if you'll draw a map to help us

24   orient some events.  So if you could just draw a very

1  simple map indicating a couple of streets.  And if

2  you'll keep in mind I'd like you to draw where you

3  were when the call came and leave room on the map for

4  where you went during the course of the incident.

5         A.    All right.  Can I turn this over to write?

6         Q.    Mm-hmm.  Yes.

7               (Witness draws)

8         Q.    Okay.  So you've drawn a map with some

9  streets on it?

10        A.    Yes.

11        Q.    Looks like Westford Street, Chelmsford

12 Street and Grand Street?

13        A.    Yes.

14        Q.    And you've drawn an X with a circle on it?

15        A.    Yes.

16        Q.    What does that indicate?

17        A.    That's the approximate location when the

18 original broadcast went out for a large gang fight.

19 We were located on Westford Street near Chelmsford

20 Street.

21        Q.    And what did you do when you heard the call?

22        A.    When the broadcast come out for a large

23 fight involving knives and machetes on Grand Street,

24 which is located here, the area cruisers were sent.

1    And when we initially received a broadcast call, I

2    took a right-hand turn traveling down Chelmsford

3    Street.

4         Q.    Will you make an arrow?

5         A.    Yes.

6                   (Witness complies)

7         Q.    And was it your intention to respond to the

8    location of the fight?

9         A.    Yes.

10         Q.    And where on Grand Street was the fight,

11    approximately?

12         A.    The fight was dispatched to Grand -- what I

13    remember hearing was Chelmsford Street near Grand

14    Street, that's for the large fight.

15         Q.    Okay.  So you proceeded on Chelmsford

16    Street?

17         A.    Yes.

18         Q.    And you didn't make it to the location of

19    the fight, did you?

20         A.    No.

21         Q.    Why not?

22         A.    As I was traveling on Chelmsford Street

23    towards Grand Street, I had observed two individuals

24    running up the sidewalk from the area of Grand Street

1    and run into this driveway entrance located at 115

2    Chelmsford Street.

3        Q.    Two individuals?

4        A.    Yes.

5        Q.    What was -- how would you describe the

6    appearance of the individuals you saw?

7        A.    I was unable to get a physical, a complete

8    physical description because of our distance we

9    initially saw them.  We were approximately -- I was

10    approximately a hundred fifty yards is the distance

11    that I used from when we first observed them to when

12    they went in the driveway.

13        Q.    Will you just write 150 yards, please?

14        A.    Sure (writing).

15        Q.    Did you see them on Chelmsford Street or did

16    you see them on Grand Street?

17        A.    I saw them on Chelmsford Street coming

18    very -- they were very close to Grand Street.  When

19    we first observed, they were on the sidewalk of

20    Chelmsford Street.

21        Q.    What did you do then?

22        A.    At that point as I was operating the

23    cruiser --

24        Q.    Pardon me.  Will you indicate on the drawing

1    where you saw the individuals, maybe "WA"?

2        A.    This is the street.  I'm going to draw a

3    line parallel right here as the sidewalk area.  And

4    the area was right here as they were running in that

5    direction.

6        Q.    Okay.  Thank you.  Now, I'm sorry, what did

7    you do then?

8        A.    At that time we were from this distance

9    away, a hundred fifty yards.  These individuals ran

10   into the parking lot or the driveway of 115

11   Chelmsford Street.  And as I was traveling the

12   cruiser down this way, they went into the driveway, I

13   lost sight of them for about five seconds, a very

14   short amount of time, and I pulled -- can I draw my

15   cruiser where I parked it?

16       Q.    Yes.

17       A.    I parked the cruiser right here (drawing),

18   and that would be the front of the cruiser pointing

19   in that direction, and I observed the individuals run

20   in the driveway at that point.  After we came down

21   here -- what happened was this corner here where

22   there's a business, a building, blocked my line of

23   vision where the individuals came in the driveway;

24   they were running, took a left-hand turn, this corner

1  blocked my vision as I was coming down Chelmsford

2  Street.

3      Q.    How much time lapsed between the time you

4  first saw the individuals on the sidewalk and pulling

5  up to the driveway?

6      A.    Five to ten seconds.

7      Q.    In your interrogatories you mentioned

8  something about Officer McCann gesturing.  Do you

9  recall?

10     A.    That was information I had received after

11 the incident was completed.

12     Q.    So you didn't see Officer McCann at the

13 time?

14     A.    No, I did not.

15     Q.    So when you stopped the car, what did you

16 do?

17     A.    At that point I got out of the cruiser and I

18 walked to the rear and I walked into the driveway

19 (drawing) this way.

20     Q.    And then what did you do?

21     A.    At that time I walked towards the rear of

22 the driveway.  And what I'll do, I'm going to draw

23 (drawing) -- there's a building, I believe it's a

24 residence, that's on -- as you walk into the driveway

1   on the left-hand side, there's a doorway here, the

2   building wraps around this way which I remember to be

3   several garage doors, which I'm going to put a G

4   where there were garage doors, and the building came

5   that way and the doorway was here.

6       Q.   Okay.

7       A.   I proceeded to walk down the driveway where

8   there were -- there were a large group of people

9   sitting at a table here, and I'm going to mark that

10  with a T.

11      Q.   Okay.

12      A.   There were several parked cars, I believe

13  there were two, and I'm going to put a C, and they

14  were parked facing a wall that went along the

15  building there.

16      Q.   Okay.  You've drawn what looks like a

17  structure connected at a corner.  Is this sealed off?

18  I mean is this a closed -- is there an alley here or

19  what?

20      A.   No, this is a closed driveway between the

21  building structures.

22      Q.   So the only way to get to where the people

23  are around the table would be from Chelmsford Street?

24      A.   Yes.

1    Q.   Okay.

2    A.   I don't know whether or not there's a rear

3    door that allows you to come in the back of the house

4    to the driveway but for -- from Chelmsford Street

5    there's one wide driveway that leads you into the

6    area.

7    Q.   So you stopped the car because you saw the

8    individuals run into the parking lot?

9    A.   Yes.

10   Q.   Did you then turn your attention to those

11   individuals who ran in?

12   A.   Yes, yes.

13   Q.   And then what happened?

14   A.   At that point my partner, Officer Dennis

15   Moriarty, he exited the passenger side of the

16   cruiser.  He went directly over to these -- there

17   were three individuals that were standing by the wall

18   near the front of the vehicles that I have marked

19   here.  At that point I proceeded to walk behind the

20   cars to where there was approximately six or seven

21   individuals at this table.

22   Q.   Did you stop and question the three

23   individuals?

24   A.   No.

1      Q.    Why not?

2      A.    That was -- Officer Moriarty proceeded

3   directly to those individuals.  I wanted to go to

4   where these individuals were because I didn't know

5   who they were and I wanted to explain to them why we

6   were there.

7      Q.    So at this point you and Officer Moriarty

8   are going to do what's essentially a Terry stop?

9      A.    Yes.

10     Q.    Okay.  You were going to question these

11  individuals you saw running?

12     A.    Yes.

13     Q.    You're going to get their names, their

14  addresses?

15     A.    Yes.

16     Q.    Okay.  Did you do that?  Did you get the

17  names and addresses of the individuals who ran into

18  the parking lot?

19     A.    I did not.

20     Q.    Did Officer Moriarty?

21     A.    He was in the process of attempting to do

22  that.

23     Q.    Okay.  Did you or Officer Moriarty check the

24  blood pressure or the pulse of these individuals to

1  see if they'd been running?

2      A.   I did not.

3      Q.   Did you ask them whether they had been

4  involved in the gang fight?

5      A.   I did not.  Officer Moriarty may have had a

6  conversation as to whether or not they were involved

7  in the gang fight right down the street.  My

8  attention was drawn to the six or seven individuals

9  seated at this table who began to argue with me as to

10  our presence in the driveway.

11      Q.   Did you recognize anyone who looked like a

12  gang member?

13      A.   The individuals at the table?  No, there

14  were no what I -- known gang members to myself.

15      Q.   How about the individual at the end of the

16  driveway, did you recognize --

17      A.   That were detained here (indicating)?

18      Q.   Yes.  Did you recognize them as Asian gang

19  members?

20      A.   After the incident, no, I didn't.

21      Q.   At the time did you recognize them as known

22  gang members?

23      A.   At that time, no.

24      Q.   Did you try to identify the property owner?

1     A.   No, I didn't.

2     Q.   Did you try to find out what kind of party

3  or gathering was going on?

4     A.   No.

5     Q.   Did the people that you were interacting

6  with look like they had recently been involved in a

7  fight?

8     A.   These people at the table?

9     Q.   Yes.

10    A.   No, they did not.

11    Q.   Did the other people look like they had

12  recently been involved in a fight?

13    A.   I didn't observe physical injuries on them.

14    Q.   In what way?

15    A.   Like there was no blood or ripped clothing

16  or -- that's -- if that would be the result from

17  being in a fight or physical altercation, I didn't

18  observe any of that.

19    Q.   So they did not look like they had recently

20  been in a fight?

21    A.   In which they were injured, no.

22    Q.   What other way might they have looked like

23  they were in a fight?

24    A.   Well, you can be in a fight and come out on

1    the winning end without being injured or harmed.

2        Q.    But did you have any basis based on being a

3    precipient witness at the time observing these

4    individuals, did anything about their appearance look

5    to you like they may have been in a fight?

6              MR. LEAHEY:    Objection.    Phrase of the

7    question regarding "precipient."

8        Q.    You saw the individuals enter the parking

9    lot?

10       A.    Yes.

11       Q.    Did anything about their appearance look to

12   you like they had been in a fight?

13       A.    From their physical appearance, no.    I

14   observed no injuries, no torn clothing, no outward

15   appearance in their hands of having weapons in their

16   hands.

17       Q.    Okay.    So again the purpose for stopping

18   them was what?

19       A.    The purpose of stopping these individuals

20   was to obtain their information.    'Cause at the time,

21   when the machete fight was called in, we had not

22   received the information yet of how many people were

23   injured and what their condition was.    So the purpose

24   of detaining these two individuals that were seen

1    running from the scene of the fight was to shortly

2    detain them to find out what and if any their

3    involvement was with the fight on Grand Street near

4    Chelmsford.

5         Q.    And at some point that evening did you

6    decide that those individuals had not been involved

7    in the fight?

8         A.    At the time I was in the driveway?

9         Q.    Yes.

10        A.    I had -- I did not have that information,

11   no.

12        Q.    At some point did you -- were you able to

13   determine that those individuals were not involved in

14   the gang fight?

15        A.    I was not able to determine that.

16        Q.    Did you have any basis to arrest any of the

17   individuals who ran into the parking lot?

18        A.    At the time when they were detained?

19        Q.    Yes.

20        A.    No.

21        Q.    How about any other time?

22        A.    I'm not sure.  The individuals that were

23   detained, as Officer Moriarty approached them, there

24   were not arrestable charges on them at that time.

1      Q.   At the end of your time at 115 Chelmsford

2   Street, did you have any reason to believe that the

3   individuals at the barbecue -- sorry.  At the end of

4   your time there, did you have any reason to believe

5   that any of the individuals there were gang members?

6      A.   No.

7      Q.   Did you conduct any follow-up investigation

8   as to whether the individuals you had seen on the

9   sidewalk were gang members?

10      A.   No, I did not.

11      Q.   Did you sustain any injuries that night?

12      A.   No.

13      Q.   Do you know if Officer Moriarty sustained

14   any injuries that night?

15      A.   I don't believe he did.

16      Q.   If either one of you had, would it have been

17   proper procedure to put it in your police report?

18      A.   If one of us had been injured during this

19   altercation, yes.

20      Q.   And was a use-of-force report prepared

21   regarding any of the incidents that night?

22      A.   I did not write one, no.

23      Q.   Do you know if Officer Moriarty wrote one?

24      A.   I'm not sure.

1          Q.    Okay.   Do you know how many people were

2    arrested as a result of the gang fight on Grand

3    Street?

4          A.    I believe there were two and possibly three.

5          Q.    I'm going to show you some documents.

6                MS. BILLS:   May I have this marked,

7    please?

8          (Exhibit No. 6 marked for identification)

9          Q.    I show you what's been marked Exhibit 6.

10   Can you identify this document?

11         A.    Yes.

12         Q.    What is it?

13         A.    This is a copy of a Lowell Police Department

14   arrest report that's dated September 9th of 2001.

15   The defendant's name is -- his last name is Im, I-m.

16   I believe the first name is Pheaktra.

17         Q.    And this person was arrested as a result of

18   the fight on Grand Street that night?

19         A.    Yes.

20         Q.    At the end of this police report if you read

21   the last sort of paragraph, the second sentence,

22   second-to-last sentence?

23         A.    Okay.

24         Q.    It indicates that several other individuals

1    the sidewalk?

2        A.    Yes, it does.

3        Q.    Okay.  Will you just fix your drawing so

4    that that's accurate?

5        A.    Yes.

6        Q.    Thank you.

7                MR. GAMBACCINI:  No art school for you.

8                MR. LEAHEY:  I believe the drawing's

9    probably not to scale.

10       A.    No, it's not.

11               MR. LEAHEY:  And just his best

12   representation.

13               MS. BILLS:  Obviously.

14       A.    Okay.

15       Q.    Thank you.  I'd like to ask you some more

16   questions about the location.  Do you recall what

17   make of car was parked there?

18       A.    I don't.  I do not know the make of car that

19   was parked there.

20       Q.    When you were driving on Chelmsford Street

21   and you first saw individuals down the block, were

22   there other people on Chelmsford Street?

23       A.    No.

24       Q.    So the only people you saw on Chelmsford

1  Street were the two individuals you described headed

2  towards 115 Chelmsford?

3       A.    That's right.  The only other -- I remember

4  seeing a Lowell police cruiser that was parked here,

5  I'll mark it LPD, that was parked at Chelmsford and

6  Grand Street.  That's the only other --

7       Q.    When you saw the individuals, you said they

8  were moving towards you and your car was moving

9  towards them; is that correct?

10       A.    Yes.

11       Q.    And you also said that some point, maybe for

12  a few seconds, your view of them was blocked

13  temporarily?

14       A.    Yes.

15       Q.    But when you saw them -- describe what they

16  looked like?  What height were they?  What kind of

17  clothing were they wearing?

18       A.    I was unable to determine the height.  The

19  actual physical appearance from being approximately a

20  hundred fifty yards away operating a police

21  cruiser -- I'm moving in a police cruiser and two

22  individuals are running and it's about a hundred

23  fifty yards away, I could not get an accurate

24  physical description.

1     Q.   Give me the best description you can give.

2     A.   The best description I can give you is the

3 two individuals that ran into the -- were running up

4 the sidewalk and into the driveway both had black

5 hair.

6     Q.   Could you tell me --

7     A.   They were males.

8     Q.   -- what race they were?

9     A.   No, I could not be certain.

10    Q.   What about their appearance made you think

11 they were possibly involved in the gang fight?

12    A.   Well, the information that was broadcast to

13 us with a gang fight of 20 to 30 Asian males armed

14 with machetes and knives and the position of the

15 Lowell police cruiser here, and from -- with these

16 individuals, I first observed them running away from

17 the area of Grand Street, at the time the police

18 arrival of the fight, led me reasonably to believe

19 that they could possibly have been involved.

20    Q.   Could you see their skin color?

21    A.   I would have been able to see their skin

22 color, yes.

23    Q.   What did it look like?

24    A.   It was lighter, it was not black skin, I

1    know it was light.  But I could not tell whether they

2    were caucasian males, Asian males, Spanish, but I

3    know they were not dark-skinned.

4         Q.    Do you recall anything about the clothing

5    they had on?

6         A.    I don't.

7         Q.    When you got close to them, you were able to

8    see them better when you were in the driveway; is

9    that right?

10        A.    Briefly, yes.

11        Q.    And what do you remember about their

12   appearance when you were closer to them?

13        A.    That they were three Asian males.

14        Q.    Okay.  How tall were they?

15        A.    I'm not able to give you their height and

16   weight.  I didn't go close enough to them to observe

17   their physical height and weight.  Officer Moriarty

18   approached them.  And as I had indicated before, I

19   was in the middle of the driveway and I walked

20   directly towards the rear of the driveway where there

21   were more people.

22        Q.    You said when they were on Grand Street,

23   they were two and then you just said there were three

24   when they were at 115 Chelmsford Street?

1      A.   Yes.

2      Q.   So how did two become three?

3      A.   I reasonably believe that someone in the

4  driveway joined the group of two that had ran in

5  there.

6      Q.   So you and Officer Moriarty had seen two

7  individuals?

8      A.   Yes.

9      Q.   And then you got out of the car and Officer

10 Moriarty says -- tells three individuals to get up

11 against the wall?  Is that what happened?

12     A.   Apparently, it could have been.  I don't

13 know whether he used those exact words but --

14     Q.   Okay.  How far were you from the three

15 people when they were against the wall?

16     A.   A reasonable distance, which if an average

17 car is 10 feet in length, 20 to 25 feet.

18     Q.   And you couldn't see anything about their

19 height or weight or anything?

20     A.   I did not make that observation.

21     Q.   When you and -- who got out of the car

22 first?

23     A.   I believe it was simultaneously.

24     Q.   Okay.  Who said something first, you or

1   Officer Moriarty?

2        A.   I don't recall.

3        Q.   What do you recall being said after you got

4   out of the car, by anyone?

5        A.   When I got out of the car, Officer Moriarty

6   went to the three individuals here and he was giving

7   them instructions as to not move, I remember that.

8        Q.   Let me slow you down.

9        A.   Sure.

10       Q.   What do you remember him saying

11  specifically?

12       A.   I specifically remember him saying he wanted

13  to see the hands of the individuals.  "Take your

14  hands out of your pockets.  Let me see your hands."

15       Q.   And how did they respond?

16       A.   I did not -- when he said that, I wasn't

17  watching the three individuals so I don't know how

18  they responded.

19       Q.   Did you hear any response, verbal response?

20       A.   Not that I can remember.

21       Q.   Okay.  What was the next thing that you

22  heard?

23       A.   At that point my attention was drawn to this

24  table with the six or seven individuals here who

1    Q.    But it was information you had left out of

2    your report when you first wrote it?

3    A.    Of the initial, when I wrote this right

4    after the incident, yes, I did not put that in the

5    first three paragraphs.

6    Q.    Okay.  Show you another document.

7    (Exhibit No. 10 marked for identification)

8    Q.    I'm showing you a document that's been

9    marked Exhibit 10.  Do you recognize it?  Yes?

10    A.    Yes.

11    Q.    What is it?

12    A.    This is a -- it's a copy of what's called a

13    CAD operations report.  CAD refers to computer-aided

14    dispatch.  The information entered on this form is

15    done in the communications room at the Lowell Police

16    Department by a dispatcher.

17    Q.    Okay.  If you turn to the second page,

18    there's something called a call log?

19    A.    Yes.

20    Q.    And there's a column that says Officer

21    Names?

22    A.    Yes.

23    Q.    What does that refer to?

24    A.    Officer names corresponds to the officers

1    that use the radio at the night -- during the night.

2        Q.    And the third page the first two entries say

3    "Sullivan."  Is that you?

4        A.    Yes.

5        Q.    Who is Quirbach?

6        A.    Quirbach was another officer assigned to the

7    Community Response Unit that actually provides.

8        Q.    So does this report indicate that you two

9    officers were together when you made a call?

10        A.    No.  This report -- it doesn't reflect that.

11    When a dispatcher entered up -- the next name down is

12    Frechette.  Frechette and Quirbach, to the best of my

13    knowledge, they were working that night, but they did

14    not respond to the scene until after.  They were on

15    another assignment.

16        Q.    What do you mean "until after"?  They did

17    respond?

18        A.    I remember seeing Officer Quirbach after the

19    defendants had been transported from the scene, I

20    remembered -- prior to me leaving, I remembered him

21    arriving.

22        Q.    So in addition to the other officers we've

23    discussed earlier, Officers -- I'm sorry --

24    Quirbach --

1          A.    Quirbach.

2          Q.    -- and Frechette you now recall also

3    responded to the scene?

4          A.    Well, Officer Quirbach I remember seeing at

5    115 Chelmsford Street after the individuals had been

6    arrested and transported to the station.  Within that

7    five minutes before the scene was secured, I remember

8    seeing Officer Quirbach very briefly.

9          Q.    Okay.  And Officer Frechette?

10         A.    I don't recall Officer Frechette with him.

11               MS. BILLS:  I'm going to mark another

12   document.

13         (Exhibit No. 11 marked for identification)

14         Q.    I'm showing you what's been marked Exhibit

15   11.

16         A.    Okay.

17         Q.    Do you recognize it?

18         A.    It's a To From letter from the Lowell Police

19   Department from Crime Analysis Unit, but I have not

20   seen it before.

21         Q.    Can you -- this is a very bad copy.  But are

22   there -- it appears there are words that are typed

23   and words that are written in as well; is that

24   correct?

Exhibit 4

# LOWELL POLICE DEPARTMENT

OFFICER'S ARREST REPORT   PAGE 1 OF 2

☑ Adult
☐ Juvenile

CASE #

ARREST # 01-18740

DATE 9-9-01

| DEFENDANT(S) | NAME | ADDRESS | | D.O.B. | SS # |
|---|---|---|---|---|---|
| | PHAYSANH KHAKEO | 115 Chelmsford St Lwl | ☑ M ☐ F | 4-3-63 | 392-86-12 |
| | NAME | ADDRESS | ☐ M ☐ F | D.O.B. | SS # |
| | NAME | ADDRESS | ☐ M ☐ F | D.O.B. | SS # |

CHARGE(S) Disorderly Conduct
Resisting Arrest
A & B on a Police Officer

| | CODE | OFFICER(S) | BADGE # |
|---|---|---|---|
| | | Dennis Moran | 212 |
| | | Lt. K. Sullivan | 111 |
| | | | |

WHERE ARRESTED  115 Chelmsford St Lwl

GEO CODE  W

DATE OF ARREST 9/9/01

TIME OF ARREST 7 1pm

IF APPLICABLE / NAME OF VICTIM (FIRM NAME IF BUSINESS)

ADDRESS                    PHONE / HOME        PHONE / BUSINESS

STATEMENT – REMARKS ETC. – USE CONTINUATION PAGES IF NECESSARY

On the above date and time while assigned to the Lowell Police (gang unit), my self and Lt Sullivan were responding to a 911 emergency call for a large group fight at the bottom of Grand St. The Radio room broadcast stated that Thirty asians were fighting with bats and possibly Machetes while traveling down Chelmsford St I noticed Two marked Lowell Police Cruisers off at the Scene and Numerous Asian males leaving the Scene Seeing this Lt Sullivan Stopped the Cruiser at 115 Chelmsford St by the entrance to the old Prices bakery Numerous Asian males were in the drive way at this Time we both exited the Cruiser and ordered the males against the wall in the process one male was concealing a black object under his shirt I immediately ordered him to the wall and Conducted Pat Frisk locating a small black cell phone. The group started to tell myself and Lt Sullivan we Had Nothing on them and started to raise there Voices and began to swere both

SUPERVISOR APPROVING BADGE #   ARRESTING OFFICER(S) SIGNATURE Dennis Moran #212

REVIEWER

COPIES TO

LPD-001         WHITE – Record Bureau      YELLOW – Prosecutor      PINK – Arresting Officer

DATE 2/8/01
PAGE 2 OF 2
OFFICER(S) Moriarty + Lt Sullivan
DEFENDANT PhaysanH Khake

STATEMENT – REMARKS

Lt Sullivan and myself attempted to explain the Seriousness of the call and our actions why we ordered them to the wall at this time the group began to argue with both officers and refused to comply with any of our demands (I called) for A Secondary Cruiser to respond for our officer safety, prior to the unit responding ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ when I told him my Name and once again attempted to calm him down the Defen ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (I then called) howell dispatch for back up units and began a violent struggle with the Defendant. during this struggle the Defendant and myself wrestled on Two parked MV's and then onto the pavement I was unable to Handcuff the Defendant til back up units responded to assist me during this struggle Lt Sullivan was Assaulted by a Second Defendant and Numerous officers responded and Cleared the Area out during this time a Third Defendant was Arrested Two Defendants were Arrested at the bottom of Gorham St and a machette was retrieved at the Scene And it was also reported that a Asian male Fled with a Hand Gun while waiting for the wagon (Officer Michael Mccann) stated Numerous Asian males had Fled the Scene and went to 115 Chelmsford and He also stated that He has had Numerous dealings with the group in the Past All the Defendants were placed into the wagon and transported to howell via the wagon.

| CRIMINAL COMPLAINT | 0111CR006131 |
|---|---|

**Trial Court of Massachusetts**
**Lowell District Court**

DEFENDANT

KHAKEO, PHAYSANH
115 CHELMSFORD STREET
LOWELL, MA 01851

TO ANY JUSTICE OR CLERK-MAGISTRATE
OF THE LOWELL DISTRICT COURT

| DATE OF BIRTH | SEX | RACE | HEIGHT | WEIGHT | EYES | HAIR |
|---|---|---|---|---|---|---|
| 04/03/1963 | M | A | 5'07" | 190 | BRO | BLN |

INCIDENT REPORT #

SOCIAL SECURITY #
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

DATE OF OFFENSE
09/09/2001

PLACE OF OFFENSE
LOWELL

COMPLAINANT
CHANDONNET, MICHAEL

POLICE DEPARTMENT
LOWELL PD - COMMUNIC

DATE OF COMPLAINT
09/10/2001

RETURN DATE AND TIME

The undersigned complainant, on behalf of the Commonwealth, on oath complains that on the date and at the location stated herein the defendant did commit the offense(s) listed below.

COUNT-OFFENSE

1. 265/13D/A  A&B ON POLICE OFFICER c265 §13D

on 09/09/2001 did assault and beat MORIETTY, a police officer who was then engaged in the performance of his or her duties, in violation of G.L. c.265, §13D. (PENALTY: house of correction not less than 90 days, not more than 2½ years; or not less than $500, not more than $5000.)

COUNT-OFFENSE

2. 268/32B  RESIST ARREST c268 §32B

on 09/09/2001 did knowingly prevent or attempt to prevent a police officer, as defined in G.L. c. 268, §32B(c), who was acting under color of his or her official authority, from effecting an arrest, by: (1) using or threatening to use physical force or violence against the police officer or another; or (2) using some other means which created a substantial risk of causing bodily injury to such police officer or another, in violation of G.L. c. 268, §32B. (PENALTY: jail or house of correction for not more than 2½ years; or not more than $500; or both).

COUNT-OFFENSE

3. 272/53/F  DISORDERLY CONDUCT c272 §53

on 09/09/2001 was a disorderly person, in that he or she did, with purpose to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, engage in fighting or threatening, or in violent or tumultuous behavior, or did create a hazardous or physically offensive condition by an act that served no legitimate purpose of the defendant, in violation of the common law and G.L. c.272, §53. (PENALTY: jail or house of correction for not more than 6 months; or not more than $200; or both.)

COUNT-OFFENSE

| COMPLAINANT | SWORN TO BEFORE CLERK-MAGISTRATE | ON (DATE) | TOTAL COUNTS |
|---|---|---|---|
| X | X | | 3 |

| (DEFENDANT COPY) | FIRST JUSTICE Hon. | | COURT ADDRESS | Lowell District Court 41 Hurd Street Lowell, MA 01852 |
|---|---|---|---|---|
| A TRUE COPY ATTEST: **X** | CLERK-MAGISTRATE/ASST. CLERK | ON (DATE) | | |