# Exhibit 11

```
 1              TRIAL COURT OF MASSACHUSETTS
                   LOWELL DISTRICT COURT
 2

 3      - - - - - - - - - - - - - - - - - -x

 4      COMMONWEALTH OF MASSACHUSETTS

 5                      Plaintiff,

 6      v.                          CASE NO 01-11CR6132

 7      INTHALA VANNARAJ,

 8                      Defendant.

 9

10            And

11

12      COMMONWEALTH OF MASSACHUSETTS,

13                      Plaintiff,

14      v.                          CASE NO. 01-11CR6131

15      PHAYSANH KHAKEO,

16                      Defendant.

17      - - - - - - - - - - - - - - - - - -x

18                                        VOLUME II-7

19                                        PAGES 1-25

20

21              TESTIMONY OF VYRASACK KHAKEO

22                      August 6, 2002

23

24
```

```
 1          Q.    Okay.  Ae, does he still live in the Lowell
 2   area?
 3          A.    No, he's not.
 4          Q.    Do you know where he's moved to?
 5          A.    I believe Wisconsin.
 6          Q.    Okay.  And does Mounie still live around
 7   here?
 8          A.    Yes, he does.
 9          Q.    You can put the pointer down.  Where you and
10   Mounie and Ae were standing, did the police direct
11   their attention to you at some point?
12          A.    Yes.
13          Q.    Do you remember which -- do you know who the
14   officers are today that were there?
15          A.    Yes.
16          Q.    Do you know their names?
17          A.    Yes, I do.
18          Q.    Who are the officers?
19          A.    Officer Moriarty and Sullivan.
20          Q.    Okay.  Who was in uniform, if you know?
21          A.    Sullivan.
22          Q.    Okay.  Officer Moriarty and Sullivan came
23   out to the property.  One of those officers said
24   something to you, Ae and Mounie?
```

```
 1        A.    Yes.
 2        Q.    Which officer was that?
 3        A.    Officer Moriarty.
 4        Q.    What did he say?
 5        A.    He was ordering us onto the wall.  He was
 6   swearing, you know, just yelling, get the F on the
 7   wall.  We were kind of confused, you know.
 8        Q.    What did you do?
 9        A.    I got on wall.
10        Q.    When you say got on the wall, kind of like
11   that position --
12        A.    Yeah, my hands on it.
13        Q.    Okay.  What about Mounie and Ae?
14        A.    They both did the same.
15        Q.    Okay.  Did Officer Moriarty do something at
16   that point?
17        A.    Oh, yeah, he just briefly checked us and
18   that was it.
19        Q.    Okay.  When he checked you, he didn't take
20   anything off of you, did he?
21        A.    No, he didn't.
22        Q.    Did he take anything off of Ae?
23        A.    No.
24        Q.    How about Mounie?
```

```
 1        A.    No.
 2        Q.    Okay.  Then what happened?
 3        A.    Then he went around towards the table where
 4   my uncle was sitting, and he was just yelling,
 5   yelling.  He told people to get on the wall.  My uncle
 6   was just asking him, I think you got the wrong place.
 7   You know, just asking him.
 8              MR. MCMAHON:  Objection, Your Honor.
 9              THE COURT:  That last statement I
10   think you have is stricken.  The jury is to disregard
11   it.
12        Q.    When he told the people in the area where
13   your uncle were to get on the wall, did your uncle say
14   something to him?
15        A.    He asked him his name.
16        Q.    Okay.  Did Officer Moriarty respond at that
17   point?
18        A.    Yes, he did.
19        Q.    And what did he say in response to your
20   uncle asking his name?
21        A.    He told him to shut the F up.
22        Q.    Okay.  At some point did Officer Moriarty
23   give your uncle his name?
24        A.    Yes, he did.
```

```
 1          Q.    And describe how that occurred.
 2          A.    Well, he said, I'm Officer Moriarty.  Right
 3    after that he asked him what is your F'n name.  And at
 4    this point he had -- my uncle had his hands up in the
 5    air, and he just told his name like, you know, because
 6    he was questioned his name.
 7          Q.    So what did your uncle say?
 8          A.    He just said I'm Phaysanh Khakeo.
 9          Q.    And then what happened?
10          A.    And then he just told him to shut the F up
11    again at one time real loud and just started hitting
12    him.
13          Q.    Did you see where he struck him?
14          A.    Struck him in the head.
15          Q.    And did you see whether he hit him with his
16    hand or anything else?
17          A.    It was a black object.  I believe it was a
18    flashlight.
19          Q.    It looked like a flashlight?
20          A.    It looked like a flashlight.
21          Q.    Did you see your uncle strike the officer at
22    any time in any way?
23          A.    No.
24          Q.    What did you do while your uncle was getting
```

```
 1    struck by the officer?
 2         A.   I still had my hands on the wall.  I just
 3    looking to my right towards it.
 4         Q.   You didn't get involved in any way?
 5         A.   No.
 6              MR. RAPPAPORT:  No further questions.
 7              MR. WYMAN:  If I may, Your Honor.
 8    Briefly.
 9                    CROSS-EXAMINATION
10    BY MR. WYMAN:
11         Q.   Mr. Khakeo, when you heard the sirens coming
12    down street --
13         A.   Yes.
14         Q.   -- where were you?  If you could show us
15    right on that little chalkboard.
16         A.   When I heard it, I was over here.
17         Q.   Okay.  Were you sitting at the table?
18         A.   No, I was just -- just around, you know,
19    with the kids and stuff.
20         Q.   Where were these guys, Mounie and Ae?
21         A.   They are at the same table, the table.
22         Q.   Okay.  So at some point you all three kind
23    of together walk up to the front of the property?
24         A.   Yeah.
```

1    Q.    When Moriarty hit your uncle, what does Mr.
2    Vannaraj do?  Do you have a chance to see him?
3    A.    They really -- I was paying most of my
4    attention towards them.
5    Q.    And when Moriarty hit your uncle, what if
6    anything do you have a chance to see Officer Sullivan
7    do?
8    A.    He was just standing around.  All I hear is
9    just chairs flying.
10    Q.    All right.  Do you ever see Mr. Vannaraj and
11    Officer Sullivan get into any sort of altercation?
12    A.    No.
13              MR. WYMAN:  Thank you, sir.
14              THE COURT:  Okay.  Thank you.
15                   CROSS-EXAMINATION
16    BY MR. MCMAHON:
17    Q.    Good afternoon.
18    A.    Hi.
19    Q.    I believe you just testified during a
20    confrontation with your uncle, Mr. Khakeo and Officer
21    Moriarty you heard chairs flying?
22    A.    Yes.
23    Q.    Do you have any idea where those chairs were
24    coming from?

```
 1        A.    It was from the tables.
 2        Q.    Okay.  Was that because people were standing
 3   up?
 4        A.    Yes.
 5        Q.    Okay.  Would you describe that as people
 6   jumping up and knocking over chairs?
 7        A.    No.
 8        Q.    So they stood up in an orderly fashion?
 9        A.    Yes.
10        Q.    And that knocked over chairs?
11        A.    No.
12        Q.    What knocked over the chairs?
13        A.    Police officer did.
14        Q.    Which police officer knocked over chairs?
15        A.    Sullivan.
16        Q.    So a moment ago when you said that people
17   stood up and that knocked over chairs, was that
18   incorrect?
19        A.    People -- what do you mean?  People didn't
20   knock over chairs.  They just stood up.
21        Q.    Well, a moment ago I just asked you if
22   people stood up and that's what knocked over chairs,
23   and you said that's what knocked over chairs.  Was
24   that not what knocked over chairs?
```

```
 1       A.    No.
 2       Q.    So it's now your testimony that Lieutenant
 3  Sullivan knocked over chairs?
 4       A.    Yes.
 5       Q.    And that was after people stood up in an
 6  orderly fashion?
 7       A.    Yes.
 8       Q.    What did you see those people do after they
 9  stood up in an orderly fashion?
10       A.    They just stood up.
11       Q.    What time did you arrive at the barbecue?
12       A.    At around five.
13       Q.    Five p.m.?
14       A.    Yes.
15       Q.    So you had been there for a couple of hours?
16       A.    Yes.
17       Q.    You had been watching the football game?
18       A.    Yes, I was.
19       Q.    And you had been drinking some beers?
20       A.    No.
21       Q.    So you were not drinking?
22       A.    No, I wasn't.
23       Q.    Did you see other people drinking?
24       A.    I don't know who was drinking.  I just --
```

# Exhibit 12

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| PHAYSANH KHAKEO,<br>   Plaintiff<br><br>v.<br><br>DENNIS MORIARTY,<br>in his individual capacity,<br>KEVIN SULLIVAN,<br>in his individual capacity,<br>and the CITY OF LOWELL,<br>   Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION NO. 04-11941-RWZ |

**PLAINTIFF PHAYSANH KHAKEO'S ANSWERS TO DEFENDANT KEVIN SULLIVAN'S FIRST SET OF INTERROGATORIES**

The Plaintiff, Phaysanh Khakeo, by and through his undersigned counsel and pursuant to Fed.R.Civ.P. 33, hereby responds to Defendant Kevin Sullivan's first set of interrogatories.

GENERAL OBJECTIONS

A. The Plaintiff objects to each and every interrogatory to the extent that any such interrogatory may be construed to request the Plaintiff to provide any information which is protected by the attorney-client privilege.

B. The Plaintiff further objects to each and every interrogatory to the extent that any such interrogatory may be construed to request the Plaintiff to provide any information prepared in anticipation of litigation or for trial by or for the Plaintiff and their representatives, attorneys, and agents, or which disclosed mental impressions, conclusions, opinions, or legal theories or any attorney or other representative of the Plaintiff concerning this litigation. Such information is privileged as work product, and the Plaintiff is not required to produce them except as provided under Fed.R.Civ.P. 26(b).

**INTERROGATORY NO. 5**

For the time period from January, 1995 until the present, please state: the name and business address for each of your employers; the nature of your work and duties for each position held during that time period; and, for each such position, the date and reason that you left such employment.

**RESPONSE NO. 5**

In 1995, I worked for a company called Lightolier, in Massachusetts, which makes light fixtures (recessed light, commercial, residential, industrial). I was in sales, including selling to distributors nationwide and answering technical questions. In approximately 1996 or 1997, I left in order to start my own real estate business in Lowell, MA. My family and I moved to Arkansas in or around 2004, where I have been trying to establish an insurance agency business. See also, Response No. 1 for current employment information.

**INTERROGATORY NO. 6**

If, other than this lawsuit, you have been involved as a party in a civil lawsuit, please provide the following information for each such lawsuit: the name and address of each party to the lawsuit, both plaintiff(s) and defendant(s); a brief description of the nature of the lawsuit; the court in which the lawsuit was filed and the date of such filing; the name(s) and address(es) of the attorney(s) involved in the lawsuit; and, a brief description of the resolution of each such lawsuit.

**RESPONSE NO. 6**

On information and belief, in or around 1992, the car I was driving was struck by another car. As a result of this automobile accident, I received a small settlement, but I do not recall whether or not a lawsuit was filed on my behalf or other specifics such as the parties' names. I believe that Attorney Marcotte of Lowell represented me in this matter. My recollection is that I received a settlement for my dislocated back and vehicle damage somewhere in the range of $10,000 to $20,000.

**INTERROGATORY NO. 7**

Please describe, fully and in complete detail, your activities and whereabouts beginning from the point twenty-four (24) hours prior to the incident occurring on September 9, 2001 and ending with the incident itself, as alleged in your complaint. Within this description of your activities and whereabouts during this period of time, please identify; by name and current residential address; each individual with whom you had contact and the location of such contact.

## RESPONSE NO. 7

On Saturday and Sunday, September 8 and 9, 2001, I was working in my real estate office, at 119 Chelmsford Street, Lowell, MA 01851, which was adjacent to my home, at 115 Chelmsford Street, Lowell, MA 01851. On Saturday night, I was at home with my wife and children. On Sunday during the day for a few hours, I did paperwork, made phone calls, and met with a potential client in my first floor office. That afternoon, some of my family members and friends had gathered for a cook-out and to watch the Patriots game at my home. The guests attending our cook-out are listed as witnesses in Response No. 2. I later joined them outside in the yard/parking lot. I had been watching television for less than half an hour when the Lowell Police Officers arrived on the scene.

My family and friends and I were gathered around a table on the side of the building watching a small television inside the garage. We had the garage lights off so that we could see the television better. Suddenly, a police car drove up and parked halfway onto the sidewalk. I don't remember whether I heard a siren or not, but their headlights were shining on us. I did not see the officers until they were already on the property. Two police officers approached, and one of the guests asked, "what are you doing here?" I do not have a clear, current recollection of who said this, but I believe that it was one of my brothers. One officer replied that they had a call about a fight between Asian gangs up the street. The guest replied something like, "There's a fight up the street? Then what are you doing here?" The officers got in his face and started arguing with my guest, who told the officers that there was no fight here. He told them that we were having a family barbeque. Officer Moriarty got upset and rushed over toward him. He was swearing and yelling for him to "Shut the fuck up." My brother had been sitting down, but he stood up at this point. Because I owned the property, and I didn't want any trouble, I spoke up and asked the officer his name and purpose for being on my property. I intended to report his unacceptable conduct to his supervisor. I tried to cooperate with Moriarty, but when I asked him for his name, he got upset.

Officer Moriarty rushed over to me. He demanded that I get against the wall. He yelled, "Shut the fuck up" and "hands against the wall." He told me to put my hands up, and I did and leaned against the wall. Moriarty shouted part of his name at me, and asked, "what's your fucking name?" I told him he was being disrespectful, and in a loud voice I told him my name, "Phaysanh Khakeo." After that, everything happened so fast. He had a flashlight in his hand and he was a big guy. I had my hands up, and he was yelling in my face. All of a sudden, he hit me with his flash light in my body. He knocked me out. I don't remember exactly what happened next, but I know that I remembered more detail when I testified at trial.

I know that I blacked out. When I started to regain consciousness, I was face down on the ground and several police officers were near me. They were telling me to put my hands behind my back. I couldn't move my hands or arms. They pulled my hands back and cuffed them, dragged me, and put me in the wagon. I had blood all over my shirt, shorts, and everywhere. In the police wagon, I saw my brother and some other guys. They took me to station. At the time, I didn't know where I was. I said I needed to talk to my family and my lawyer. They put me in the back of garage in the police station. I was afraid. They wanted to clean me up before taking my picture. I said I wanted to see my family, and they said, "you can't see anyone now." I let the

paramedics clean me up. They put a bandaid over the scar and took a picture of me, and then they let me call someone.

My wound kept bleeding through the bandaid. I had so much blood on me. They asked me if I wanted to see a doctor, and I said, "of course." We then went to the hospital. I was with a police officer in a small room, in so much pain. The handcuffs were so tight, and I waited for what seemed like hours and was not seen. I asked the officer to loosen the handcuffs and he refused. I was in so much pain in my wrists that I asked if I would get bailed out on the same night if I went back to station. They told me I could, so we went back to the station. My family came, and I told them to call my attorney Bill Early or my accountant Michael Fineberg. I think they called Bill, and both Bill and Michael came to the police station. I was still bleeding. They had a camera and took pictures. Michael took me to the hospital with my family, including my wife, niece, and nephew. I got to see a doctor sometime around 1:00 or 2:00 am. I received seven stitches in my forehead. I got home at about 3:00 or 4:00 am.

I learned that many police officers came to my property, went into my house, and searched everywhere with machine guns and riot gear. My family was horrified. My daughter was only 6 years old, and she saw police with automatic weapons in their hands, marching in her house, in riot gear and black suits. They moved furniture, searched everywhere, and said "nothing, nothing" and eventually left. They searched the bottom part of my building, which is the business, and the top, which is my home. They searched everything.

### INTERROGATORY NO. 8

State with specificity your observations of Defendant Kevin Sullivan during the incident as alleged in your complaint. Please include within this response the following information: each action that you saw Defendant Sullivan take; each action that you or another individual took towards Defendant Sullivan; each statement that you heard made by Defendant Sullivan; each statement that you or another individual made towards Defendant Sullivan; and, an approximation of the distance between yourself and Defendant Sullivan during the entire duration of the incident as alleged in your complaint.

### RESPONSE NO. 8

The officer whom I now know as Defendant Sullivan arrived with the other officer, whom I now know as Defendant Moriarty. Although there was a lot of yelling and confusion, I do not remember all of the specific actions he took or words that he spoke. I do remember that Sullivan was not next to me but about 10-15 feet away when I was hit by Moriarty. He tried to keep other people away from Moriarty, while he hit me.

### INTERROGATORY NO. 9

Please state, to the best of your ability, the length of time, in minutes and seconds, from the point at which you contend that Defendant Dennis Moriarty initiated physical contact with your person until the point at which you contend Defendant Moriarty's use of physical force

ended or at which you were handcuffed, whichever is later.

**RESPONSE NO. 9**

Plaintiff lacks sufficient first hand knowledge to answer because he was knocked unconscious, and thus, he had no accurate perception of the amount of time that lapsed between being beaten and being handcuffed. Notwithstanding this objection, Plaintiff states as follows.

I am not sure, but I think from the point Moriarty started assaulting and beating me, it was approximately 10 minutes until I was in handcuffs in the wagon. I believe they called for backup when they got me on the ground and I started regaining consciousness. Lots of officers were present and several were on top of me. I later learned that they arrested only one Asian "gang" fighter out of the 20 to 30 who were allegedly fighting with weapons several blocks away, however, they also arrested three people at my family barbeque who had been doing nothing illegal. We were just eating and watching television.

**INTERROGATORY NO. 10**

Please state whether, during the twenty-four (24) hour period prior to the incident as alleged in your complaint, you drank, ingested, injected or otherwise consumed any alcoholic beverages, drug, narcotic or other type of medication. For each substance so consumed, please state: the nature of the substance consumed; the time at which the substance was consumed; and, the exact quantity of the substance that was consumed.

**RESPONSE NO. 10**

I had just joined the barbeque when the cops came. I had 1 to 2 beers. I was not drunk. Earlier in the day, I had been working at my office next door, including meeting with a client and making phone calls. The guests had been watching the Patriot's football game before I joined them approximately half an hour before the cops came.

**INTERROGATORY NO. 11**

Please describe, fully and in complete detail, any and all physical injuries, ailments or pains that you allege to have suffered as a result of the incident as alleged in your complaint. For each such physical injury, please identify: the name and address of each physician or medical professional that has treated you the injury; the name and address of each hospital, clinic or medical service provider from which you have sought treatment; the date(s) on which you have been treated for the injury; the nature of the treatment that you have received for the injury; the amount, as of the present date, of your medical bills for such treatment; and, whether the injury has been diagnosed as permanent in nature.

**RESPONSE NO. 11**

I feel lucky that I am in one piece. The day I was arrested, September 9, 2001, I was treated at Saints Memorial Hospital, Lowell, MA for a head injury. I was initially taken there by the police, but I sat and waited for approximately an hour. Finally, I asked police to remove the handcuffs because they were very painful to my wrists, but they refused to do so until I was booked at the station. Therefore, I elected to go to the station to get booked and bailed out, and then returned to the hospital to be seen (without handcuffs). That way I got to wait and be in the hospital with my family, instead of the police. I got home at 3 or 4 am. Two or three weeks later, I went to Harvard Vanguard Health Center, in Chelmsford, MA, for continued pain resulting from my head injury. I had some follow up appointments there, and I talked to the medical staff about some memory loss I was experiencing, after my wife noticed this happening. I had pain in my wrists for several weeks resulting from the handcuffs being so tight.

I continued to experience pain and swelling, itching on my head, memory problems, and pain in my wrists for several months.

I currently have no health insurance, and have not received any recent treatment. I still currently have pain and some itching around the area on my head where I got 7-10 stitches over my eyebrow, and the lump in the back of my head comes and goes and sometimes gets bigger. Hair doesn't grow in that spot anymore. I scratch it a lot. It went away and then got watery inside and came back.

Whenever I think about what happened to me, I feel upset.

**INTERROGATORY NO. 12**

If you missed any time from work as a result of the incident as alleged in your complaint, please state: the period in which you were unable to work; your average weekly wage for each position you held during such periods; and, the amount that you claim to have lost in wages as a result of the time missed from work.

**RESPONSE NO. 12**

Objection. Plaintiff is not claiming lost wages. Therefore, this interrogatory is beyond the scope of permissible inquiry.

**INTERROGATORY NO. 13**

Please describe, fully and in complete detail, any and all mental, emotional, psychological, psychiatric or other non-physical injury, ailment or malady that you allege to have suffered as a result of the incident as alleged in your complaint. For each such injury, ailment or malady, please identify: the name, address and title of each person or facility from which you sought treatment; the date(s) on which you have been treated; the nature of the treatment that you have received for such injury; the amount, as of the present date, of your bills for such treatment; and, whether the injury has been diagnosed as permanent in nature.

Please provide, fully and in complete detail, your recollection of any and all verbal comments made by individuals, whether by yourself, your acquaintances or family members, or police officers, during the time of the incident as described in your complaint. To the extent that you can, please provide the name of the person making any such statement and to whom, specifically or more generally, the statement was directed.

### RESPONSE NO. 18

I was told by various friends and family members who attended the cookout and witnessed the incidents, that everyone heard Moriarty yelling, screaming, swearing (using profanity), and commanding people to do various things, such as get up against the wall. They were all scared. I only personally remember Moriarty yelling and swearing, and I remember one of my brothers asking the police about why they were here instead of attending to the gang fight. I can't specifically remember who said that.

Please see Response No. 7 for additional statements that I remember hearing.

Signed under the pains and penalties of perjury this 12th day of April, 2005

_____
Phaysanh Khakeo

As to Objections:

_____
Howard Friedman (BBO #180080)
Jennifer L. Bills (BBO# 652223)
**Law Offices of Howard Friedman, P.C.**
90 Canal Street 5th Floor
Boston, MA 02114
(617) 741-4100

### CERTIFICATE OF SERVICE

I hearby certify that I have served, on this 12th day of April, 2005, a copy of the forgoing Plaintiff Phaysanh Khakeo's Answers to Defendant Kevin Sullivan's First Set of Interrogatories, via U.S. mail, first class postage prepaid, to the following counsel of record: Austin M. Joyce & Andrew J. Gambaccini, Reardon, Joyce & Akerson, P.C., 397 Grove Street, Worcester, MA 01605; Thomas J. Freda, Monohan & Padellaro, 43 Thorndike Street, Cambridge, MA 02141-1714; and Brian W. Leahey, Assistant City Solicitor, City of Lowell Law Department, 375 Merrimack Street, 3rd Fl., Lowell, MA 01852-5909.

_____
Howard Friedman

12